## The People v. John McKinney.

Where in a criminal case exceptions are taken to the admission of evidence and to the charge of the Court, and after conviction and before judgment the' case is brought to the Supreme Court for review upon the exceptions, the sufficiency of the information is necessarily in question.

Section 5771 of the Compiled Laws, which provides for the punishment of "any officer, clerk or other person employed in the Treasury of this State," who shall commit any fraud or embezzlement therein. includes within the terms used the State Treasurer.

The word ·"Treasury," as used in said section 5771, is not to be understood in the sense of locality, as descriptive of the particular building within which the Treasurer keeps his principal office or place of official business; but moneys are to be considered as in the State Treasury whenever and wherever they are in the official custody of the Treasurer, or subject to his direction and control.

In an information under said section it is sufficient to show that the money alleged to have been embezzled was at the time the property of the State, and in the Treasury, or in the official custody or control of the Treasurer, without showing how it got there.

Where an information contains several counts for the same offense, some of which are bad and the others good, the good counts will support a general verdict of guilty and judgment thereon.

In an information against the ·State Treasurer under said section 5771, it is not necessary to set forth the particular kind of funds embezzled—whether gold, silver or bills—or to identify them by specifying the source from which they were received.

It is not erroneous for the Court to refuse to order the prosecution to furnish a bill of particulars under the general charge contained in such an information, where it appears that a preliminary examination has been had, and the prosecuting officer states that he shall confine himself to the same charges as in such examination.

Such an order ought never to be refused where .the Court can see any reason to believe the particulars necessary to inform the defendant of the particular transactions or instances of embezzlement intended to be proved against him, so as to enable him to meet them.

On the trial of such an information, the account books kept in the office of defendant during his official term, and purporting to show all his receipts and disbursements as State Treasurer, are admissible to show that the sums alleged to have been embezzled have not been credited to the State; and this notwithstanding no part of the books is in his hand writing.

The annual reports of defendant as State Treasurer, printed by the State Printer by his direction from the books of his office, are also admissible in evidence for the same purpose.

Where the State Treasurer received from a Railway Company several drafts for a tax due from the Company to the State, which drafts were payable at different times, it was *held* that it was not necessary that the entire amount of the tax should be paid before any part of it could be regarded as in the State Treasury, but that the payment of each of these drafts was a payment of so much into the Treasury.

THE PEOPLE *v.* McKINNEY.

The omission by the State Treasurer to charge himself with the receipt of moneys in the county where his office is required to be kept, or a denial of its receipt there, would be evidence to go to the jury of an embezzlement in that county.

On exceptions, every part of the charge of the court must be presumed to be correct and to be warranted by the evidence, so far as the bill does not show the contrary.

Any act by the State Treasurer by which money should be abstracted from the Treasury, or diverted from the use of the State, with intent to apply or appropriate it to his own use or benefit, would constitute embezzlement. And as this might be done by the Treasurer without at the time being personally present where the money happened to be, *held* not error for the Court to charge the jury that it was not necessary that the money should have been in the county where the Treasurer's office is required to be kept, to warrant their finding that he embezzled it in that county.

*Heard January 9th, 10th, 11th. Decided April 25th.*

On exceptions from Ingham Circuit.

The defendant was proceeded against in the Court below by information, of which the following is a copy: "State of Michigan: Ingham County, ss.: The Circuit Court for the County of Ingham: of the term of May, A. D. 1861.

Stephen D. Bingham, Prosecuting Attorney for the county of Ingham aforesaid, for and in behalf of the People of the State of Michigan, comes into said Court in the May term thereof, A. D. 1861, and gives the Court here to understand and be informed that John McKinney late of the city of Lansing, in the county of Ingham and State of Michigan, heretofore, to wit: on the fourth day of August, A. D. 1860, at the city of Lansing aforesaid, then and there being an officer of the State of Michigan, employed in the Treasury of said State, to wit: State Treasurer of said State, did then and there by virtue of his said office and employment, and whilst he was so employed as such officer in said Treasury, have, receive, and take into his possession for the said State, certain money to a large amount, to wit: to the amount of four thousand dollars, of the property of the said State of Michigan, and the said money then and there and whilst he was so employed as such officer in said Treasury,

unlawfully, fraudulently and feloniously did convert to his own use and embezzle, contrary to the form of the Statute in such case made and provided, and against the peace and dignity of the People of the State of Michigan.

And the said Prosecuting Attorney who · prosecutes as aforesaid, further gives the Court here to understand and be informed, that the said John McKinney, late of the city of Lansing aforesaid, heretofore, to wit: on the fourth day of September, A. D. 1860, at the city of Lansing aforesaid, in the county aforesaid, then and there being an officer of the State of Michigan, employed in the Treasury of said State, to wit: as State Treasurer of said State, and being then by virtue of such his office and employment, entrusted with the receipt, custody, management and control of money of the said State of Michigan, feloniously did embezzle certain money of the said State of Michigan, to wit: the sum of other four thousand dollars and of the value of four thousand dollars, being parcel of the money of the said State of which he then had the custody, management and control, by virtue of his said office and employment in said Treasury as aforesaid, and did then and there fraudulently and feloniously apply and dispose of the same to his own use and benefit, contrary to the form of the Statute in such case made and provided, and against the peace and dignity of the People of the State of Michigan.

And the said Prosecuting Attorney who prosecutes as aforesaid, further gives the Court here to understand and be informed, that the said John McKinney, late of the city of Lansing aforesaid, heretofore, to wit: on the fourth day of October, A. D. 1860, at the city of Lansing, aforesaid, in the county aforesaid, then and there being an officer of the State of Michigan, employed in the Treasury of said State, to wit: State Treasurer of said State, and being then and there by virtue of his said office and employment in said Treasury, charged with the reception

and safe-keeping and lawful disposal of moneys of the said State, for said State, unlawfully, fraudulently and feloniously did convert to his own use and embezzle a portion of the said moneys, entrusted to him the said John McKinney for safe keeping and lawful disposal as aforesaid, to wit: the sum of other four thousand dollars and of the value of four thousand dollars, of the property of the said State of Michigan, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the State, of Michigan.

And the said Prosecuting Attorney who prosecutes as aforesaid, further gives the Court here to understand and be informed, that the said John McKinney, late of the city of Lansing aforesaid, heretofore, to wit: on the third day of November, A. D. 1860, at the city of Lansing aforesaid, in the county aforesaid, then and there being an officer of the State of Michigan, employed in the Treasury of said State, to wit: State Treasurer of said State, and being then and there, by virtue of his said office and employment, entrusted with the receipt, custody and management of moneys of the said State, did then and there, by virtue of his said office and employment, and whilst so employed as such officer in said Treasury, have, receive and take into his possession and control, a large amount of money of the said State, to wit: the sum of other four thousand dollars and of the value of four thousand dollars, and the said money then and there fraudulently and feloniously did convert to his own use and embezzle, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the State of Michigan.

And the said Prosecuting Attorney who prosecutes as aforesaid, further gives the Court here to understand and be informed, that the said John McKinney, late of the city of Lansing aforesaid, heretofore, to wit: on the fourth

10 MICH.—E.

day of December, A. D. 1860, at the city of Lansing aforesaid, in the county aforesaid, then and there being an officer employed in the Treasury of the State of Michigan, to wit: State Treasurer of said State, did then and there, by virtue of his said office and employment in said Treasury, have, receive and take into his possession and control a large amount of other moneys of the said State, to wit: the sum of four thousand dollars and of the value of four thousand dollars, and the said moneys he the said John McKinney did then and there and whilst so employed as such officer in said Treasury, unlawfully, fraudulently and feloniously convert to his own use and embezzle, contrary to the form of the statute, in such case made and provided, and against the peace and dignity of the People of the State of Michigan.

And the said Prosecuting Attorney who prosecutes as aforesaid, further gives the Court here to understand and be informed, that the said John McKinney, late of the city of Lansing aforesaid, heretofore, to wit: on the twelfth day of December, A. D. 1860, at the city of Lansing aforesaid, in the county aforesaid, then and there being an officer of the State of Michigan, employed in the Treasury of said State, to wit: State Treasurer of said State, and being then and there, by virtue of his said office and employment in said Treasury, entrusted with the receipt, safe-keeping and disbursement of money of the State of Michigan, did then and there and whilst so employed as such officer in said Treasury, unlawfully and feloniously convert to his own use and embezzle a portion of the said money which had been received by him by virtue of his said office and employment as aforesaid, to wit: the sum of other four thousand dollars, and of the value of four thousand dollars, of the property of the State of Michigan, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the State of Michigan.

And the said Prosecuting Attorney who prosecutes as aforesaid, further gives the Court here to understand and be informed, that the said John McKinney, late of the city of Lansing aforesaid, heretofore, to wit: on the twelfth day of December, A. D. 1860, then and there being an officer employed in the Treasury of the State of Michigan, to wit: State Treasurer of said State, and being then by virtue of such his office and employment in said Treasury, entrusted with the receipt, safe - keeping, and disbursement of money of the People of the State of Michigan, did then and there and whilst so employed as such officer in said Treasury, unlawfully and feloniously convert to his own use and embezzle a portion of the said money which had been received by him by virtue of his said office and employment as aforesaid, to wit: the sum of other four thousand dollars, and of the value of four thousand dollars; the said sum of four thousand dollars being at the time of the committing the felony aforesaid, the property of the People of the State of Michigan, contrary to the form of the Statute in such case made and provided, and against the peace and dignity of the People of the State of Michigan.

And the said Prosecuting Attorney who prosecutes as aforesaid, further gives the Court here to understand and be informed, that the said John McKinney, late of the city of Lansing aforesaid, heretofore, to wit: on the thirty-first day of December, A. D. 1860, at the city of Lansing aforesaid, in the county aforesaid, then and there being an officer of the State of Michigan, employed in the Treasury of said State, to wit: as State Treasurer of said State, did then and there by virtue of his said office and employment in said Treasury, have, receive and take into his possession for the said State, certain other money to a large amount, to wit: to the amount of three thousand dollars, and of the value of three thousand dollars, and

the said money afterwards, to wit: on the day, in the year and at the place last aforesaid, unlawfully, fraudulently and feloniously, did convert to his own use and embezzle; the said sum of three thousand dollars being at the time of the committing the felony aforesaid the property of the State of Michigan, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the State of Michigan.

STEPHEN D. BINGHAM,

*Prosecuting Attorney.*

STATE OF MICHIGAN, } ss.
COUNTY OF INGHAM, }

Stephen D. Bingham being duly sworn, says, that the foregoing information is true in substance, according to his best knowledge and belief.

STEPHEN D. BINGHAM,

*Prosecuting Attorney.*

Sworn and subscribed before me, this ?
     seventh day of May, A. D. 1861. ⎰

L. REED, *Clerk.*"

The following is a copy of the bill of exceptions, omitting mere formal parts:

"The said cause coming on to be tried by a jury of the said county of Ingham, for that purpose duly impanneled, good and lawful men of said county, at which time there come the said People of the State of Michigan by their proper Attorneys, Hon. Charles Upson, Attorney General, and S. D. Bingham, Prosecuting Attorney, and J. W. Longyear, Esq., for prosecution, and the said respondent John McKinney in person, as well as by his attorneys, Wm. H. Chapman, and O. M. Barnes; at which time the respondent moved said Court for an order requiring the prosecution to furnish him with a particular statement of the charges upon which they intended to rely in their prosecution under the foregoing information,

the said motion being founded upon an affidavit of said respondent that he was wholly unacquainted with the nature, character and particulars of the charges made against him in the several counts of the information, and it appearing to the Court that a preliminary examination had been had, and the Attorney General having stated that he should confine himself to the same charges as in such examination, the motion was overruled and denied by said Court, the defendant's counsel excepting; after which the jurors of the jury aforesaid, impanneled to try the said cause, being present, were then and there duly chosen and sworn to try the issue aforesaid, and upon the trial on said information the counsel for the People, to maintain and prove their said charges, offered to introduce in evidence certain books in writing, proved by Theodore Hunter, Deputy State Treasurer in 1859 and 1860, to be books kept in the Treasurer's office during that time, purporting to show the receipts and disbursements of cash in the said office, and all of said receipts and disbursements, during that time, which was proved by said Theodore Hunter to be the official term of the said John McKinney. It was also shown by the said Hunter that no part of said books was in the handwriting of said McKinney, or kept by him in person; but that they were kept by the said Theodore Hunter as deputy of the said John McKinney, and other clerks in the office of the Treasury: to the introduction of which books in evidence the counsel for the said accused did then and there object, because it did not appear that the said books were kept by the said McKinney in person. But the said Circuit Judge overruled the objection, and defendant's counsel excepted.

"From which books it appeared that the respondent had not been charged with the receipt of the specific tax due from the Detroit and Milwaukee Railway Company to the State of Michigan, for the year 1860, which was one of the amounts or sums of money claimed by said prosecution to

have been embezzled by said respondent. It also appeared by said books that the said accused was not charged with the receipt of a certain amount of interest on deposits with the Michigan Insurance Bank, of surplus funds of the State of Michigan,—seven hundred and eighty dollars of which interest money it was claimed by said prosecution was embezzled by the said accused.

"And the said prosecution further to maintain and prove their charges as aforesaid, produced and offered in evidence two certain printed books or pamphlets, purporting to be the annual reports of the State Treasurer for the fiscal years 1859 and 1860, and to be published by authority and printed by the State Printers, and to contain a statement of all receipts and disbursements for each of said fiscal years respectively, which reports were proved to be made and published by direction of the accused, from the books of his office; but to the reading of the same in evidence, the said counsel for the said respondent did then and there object, because,

*First:*—Said books were not shown to have been made by the accused in person;

*Second:*—They were not the original reports of said Treasurer's office.

But the said Circuit Judge overruled the objection, and defendant's counsel excepted.

"From which said printed books it appeared that said respondent was not charged with the receipt of the aforesaid specific tax due to the State of Michigan from the Detroit and Milwaukee Railway Company, for the year 1860, nor did it appear by said printed books that said respondent was charged with the receipt of the aforesaid amount of interest on deposits for the year 1860, with the Michigan Insurance Bank, of surplus funds of the State of Michigan. And the same annual report for the fiscal year 1860 was also offered in evidence by the prosecution, as printed and bound with the Session Laws of the year 1861, to which the same objections were taken by the defendant's counsel,

and the same ruling of the Court had, and the same exceptions taken. Whereupon the said printed pamphlets, as well as the said reports as printed with the said Session Laws, were received and read in evidence to the jury.

"C. C. Trowbridge, a witness on the part of the prosecution, testified respecting the arrangement for the payment of the specific tax due to the State of Michigan, from the Detroit & Milwaukee Railway Company, for the year 1860, as follows: That he was secretary for said company for the years 1859 and 1860. Mr. McKinney called on him as Treasurer of the State of Michigan, for the specific tax for the year 1860, in June 1860. The tax became due the first of July 1860. That he made arrangements with McKinney for the payment of the tax by drawing drafts upon the Receiver of the said Railway Company, C. J. Brydges, for the amount of the tax, $23,257.49. These drafts were dated Lansing, June 22d, 1860, payable as follows: the first, August 1st, 1860, for $4,000. The second, September 1st, 1860, for $4,000. Third, October 1st, 1860, for $4,000. Fourth, November 1st, 1860, for $4,000. Fifth, December 1st, 1860, for $4,000. Sixth, December 25th, 1860, for $3,257.49. That the said drafts were signed by John McKinney as State Treasurer, drawer of the drafts. That these drafts were payable at the Metropolitan Bank in the city of New York, to the order of the drawer, and that Mr. Brydges subsequently accepted the same, and that they were paid by the said Railway Company as they matured respectively. The tax was paid in this way for the accommodation of the Company. No receipt was ever given by Mr. McKinney for the tax of 1860, but he acknowledged by letter from New York the receipt of the drafts. This arrangement was made and the drafts drawn at Detroit, in the State of Michigan; and it was further proved that said drafts were forwarded from Detroit after they were so prepared and drawn, to Mr. Brydges at Hamilton, Canada West, and by him after acceptance sent to said McKinney

at New York city, and there by him indorsed as State Treasurer, and procured to be discounted at the Artisans Bank, New York City. D. B. Howell, another witness on the part of the prosecution, testified that he was discount clerk and general book-keeper of 'the Artisans Bank of the city of New York, in the year 1860 ; that the said accused in the month of June 1860 indorsed said drafts as State Treasurer, had 'them discounted at the said bank, and the amount thereof placed to his credit as State Treasurer, in said bank. At this time he had an open account as State Treasurer at the bank, on which there was a balance of about $24,000 in his favor besides these discounts ; that all of his deposits in said bank had been drawn out by him previous to January 1st, 1861, except the sum of about $39. The printed report before referred to for the fiscal year 1859, purported to show the receipts into the Treasury for that year to be $900,400.95, and the disbursements for the same year to be $736,823.73, leaving a balance in the Treasury of $163,577.22, and that for the fiscal year 1860, purported to show receipts into the Treasury to the amount of $856,063.31 ; and the disbursements for the same time to the amount of $721,441.43, leaving a balance on the 30th day of November, 1860, of $134,621.88 in the Treasury. Said books were also claimed on the part of said prosecution to show, in connection with other evidence, the foregoing and other acts of embezzlement on the part of said accused, which were allowed by said Court to be presented and argued to said jury.

"Upon the conclusion of the proofs and allegations on the part of the prosecution, said cause was submitted and argued to said Court and jury upon the part of the prosecution, by Messrs. Upson and Longyear ; and on the part of the defendant by Messrs. Chapman and Barnes. And thereupon the said Circuit Judge did also then and there, among other things, declare and deliver his opinion to said jury to be,

"That section 5771 of the Compiled Laws applies to the Treasurer of the State, as well as to other officers and persons employed in the office of the Treasury.

"That it was not necessary that the entire tax of the Detroit & Milwaukee Railway should be paid into the Treasury, before any portion of it could be regarded as paid into the Treasury; but the payment of each installment, as agreed upon by the Treasurer and the Railway Company, would be a payment to the extent of such installment into the Treasury.

"That the embezzlement must have been in the county of Ingham. If the proper charge to the Treasurer of the money received would have been made in this county, and that charge was not made, it would be evidence of embezzlement in this county. A denial in that county, by the Treasurer, of the receipt of the money, would be evidence of embezzlement in that county.

"That the money must have come into the State Treasury before embezzlement could be committed; that it must have come into the public funds — into the control and management of the State Treasurer. Not necessary that the funds should be in Lansing, but should be in the Treasury of the State. Not necessary that the moneys should actually have been received in this county, but it is enough if they were in the Treasury of the State. Nor is it material whether the funds embezzled were at Lansing, or Detroit, or New York. If they were in the Treasury of this State, under the control of the Treasurer, it would be sufficient.

"To all of which several opinions and charges, the counsel for the said respondent excepted.

"And the said Judge, under the charge and with the direction aforesaid, left the aforesaid issue and the evidence so given on the trial thereof as aforesaid to said jury. And the said jury afterwards then and there gave their verdict of Guilty against said defendant, upon said informa-

tion generally, of all of the charges contained in said information.

"And the said accused John McKinney, by his said counsel, moved in arrest of judgment, and alleged as grounds of error in said proceedings and verdict, the following points, to wit: *First*, the defendant is charged in the information in this cause with embezzlement under sec. 5771 of the Compiled Laws, when as this defendant alleges, the State Treasurer is not mentioned in or included within the provisions of said section 5771, or intended to be.

*Second.* The money charged to have been embezzled is not charged in any of the counts of said information to have been in the Treasury of the State of Michigan, at the time of the alleged embezzlements.

*Third.* In the information in this case, the embezzlement is not charged to have been committed in the State Treasury.

*Fourth.* The information charges no offense within said section 5771 of the Compiled Laws, or any law of this State: Which said motion was denied and overruled. To which judgment and opinions the counsel for the defendant excepted."

*O. M. Barnes*, for defendant:

1. The Circuit Judge improperly refused to require the prosecution to furnish the particulars of the charges:— *Whart. Prec. of Indict.* 1st *Ed.* 336, 340, 344, 351, 352; *Roscoe Cr. Ev.* 351; 3 *Wat. Arch.* 447—6. *n.* 1; 2 *Rus. on Cr.* 189; *Tif. Crim. Treat.* 298, 299. Neither the examination nor the statement of the Attorney General could form any part of the record in the case. The information is that upon which the accused is tried, and no resort could be had on the trial to the preliminary examination to determine the relevancy or irrelevancy of evidence: such examination contains evidence, and not *charges*, and often, necessarily, foreign and irrelevant matter.

THE PEOPLE v. McKINNEY.

To give information to the accused is not the only object of the particulars of the charges. The general object is to make that specific which in the information is too general, and the reasons for this specificness are, among others:

1st, that the defendant may know what act or crime it is that he is called upon to answer:

2nd, that the jury may appear to be warranted in their conclusions of guilty or not guilty:

3rd, that the defendant's conviction or acquittal may inure to his subsequent protection, should he be again questioned on the same grounds:

4th, that the Court may see whether the facts charged are sufficient to warrant a conviction; and may see a precise and definite transgression on the record, so as to be able to apply the punishment which judicial discretion may dictate or positive law require: — *Erskine in Stockdale's case*, *Brit. El.* 684; *Whart. Crim. Law*, 121, 122.

The particulars of the charges were the more necessary because the several counts of the information charged, apparently, different offenses; whereas but a single crime can, lawfully, be included in one information for this offense; and if more than one can be included, the necessity for the particulars is thus increased: — *Tif. Crim. Treat.* 134, 135; *Whart. Cr. L. 2d Ed.* 150, 152; *Cane v. People*, 8 *Wend.* 203.

2. The Court erred in admitting in evidence the books from the Treasurer's office, purporting to be the cash books of receipts and disbursements, so long as it appeared that the same were not in the hand writing of the defendant, and had not been kept by him.

The nature of the fact to be proven, and the object of the evidence, determine the admissibility or inadmissibility of the evidence offered. Here the evidence was offered for the purpose of proving that the defendant had not charged himself, or made certain entries on the book,

When it was shown that he made none of the entries or charges, but that they were all made by another, he could not be held liable in a criminal case for what it showed. Its competency depended on its being his act: 2 *Rus. on Crimes*, 171; *White's case*, 34 *Eng. C. L.* 614.

3. The Circuit Judge erred also in admitting in evidence the printed documents.

The same reasoning may be applied to this evidence as to the account books, as the object and nature of the fact to be proven were the same.

The competency of the evidence all depended on the report being shown to be the act of the defendant in *fact*, and it was clearly shown not to be his *in fact*.

4. The Court erred in charging that § 5771 of the Compiled Laws applies to the Treasurer of the State.

If it had been the intention of the Legislature to embrace the State Treasurer himself in this statute, it would be reasonable to expect that he would have been expressly named, there being but one. See for example, 2 *Comp. L.* § 5770. "*If any cashier or other officer*" &c.

It may be argued too that the Legislature did not intend to include the State Treasurer, because such a thing is nearly if not entirely unknown in legislation, and in violation of the science of government.

In the case of the heads of government, honor, and a fear of impeachment and disgrace, are a far more safe reliance than penal enactments.

The State Treasurer is properly enough subject to impeachment, which is the most terrible trial to which a high functionary can be subjected : — 1 *Story on Const.* § 688, &c.

Again, the Treasurer of the State is required by law to give bond, to secure to the State the safe keeping and lawful disposal of all moneys that come into his hands, and the faithful discharge of all his duties. The other officers and persons employed in the Treasury of the State give no bonds to the People.

Now it seems reasonable that the Legislature should enact penal laws against these subordinates who give no bonds, while it seems equally] unreasonable that the provisions of this section should be applied to the Treasurer who gives the bond.

Again, it can not be supposed that the Legislature (in two consecutive sections especially), intended to make one and the same act amount to two distinct crimes. The Attorney General contended in the Court below, that one and the same act might and did constitute the two offenses created by sections 5771 and 5772 of the Comp. Laws. This absurdity is only to be avoided by considering the State Treasurer as not included in § 5771.

The word "*employed*" as used in this section clearly means *retained* or *procured to render service, as a master employs a servant*, a principal an agent or clerk. It does not here mean *occupied*. This is plain from this fact; embezzlement always implies a breach of trust and confidence, and the word *employed* used in the sense of *occupied* implies no confidence. A thief breaking into the Treasury might be said, while in the act of stealing, to be occupied in it.

The word is here used in the same sense as in other statutes on embezzlement. It is the identical word used in the statutes of 39 *Geo.* 3, *c.* 85, § 1, and 7 and 8 *Geo.* 4, *c.* 20, § 47, in regard to embezzlement by clerks, servants and agents.

Statutes that are understood to apply to embezzlement by fiscal agents or officers, do not use the word *employed*, but "Officers *charged* with the safe keeping, &c. of the public funds," &c. See *Acts of Congress of July* 4, 1840, *and August* 13, 1841; *Whart. Prec. of Ind.* 207.

The Treasurer is the head of the department, the chief, the principal, having a right to appoint a deputy and to *employ* clerks and persons to aid him in his duties. (See *Comp. L.* §§ 155, 156).

He is elected to an office, not *employed.* He is the representative of the People, for the safe keeping and lawful disposal of the public funds. He is a chief in his department, a depositary of sovereignty, as much so as the Governor or the Judges of the Supreme Court. No *other person* has under the law any power to *employ* persons in the Treasury. To treat him therefore as a person employed in the Treasury, seems a misapplication of terms.

The term *embezzlement.* is used in this statute manifestly in the same sense as in the criminal law generally. It is a crime that can only be committed by a person in the employ of another. The relation of employer and employed must exist. In this sense it is used in § 5773 of Comp. Laws—and in English and American statutes generally. See also 1 *Bouv. L. D.,* "*Embezzlement;*" 2 *Bish. Cr. L.* §§ 280, 282 *& n.,* 286, 296; *Roscoe Cr. Ev.* 450; 3 *Wat. Arch.* 449, *n.* 1.

Again, while the State Treasurer is bound by an oath, and a bond with sureties, for the safe keeping and lawful disposal of the public moneys, and to deliver over the same to his successor in office, nevertheless, the law as it stands makes him accountable to no one whomsoever for the employment of the moneys so long as he holds the office. It seems idle to talk of embezzlement by a person who is not, at the time of the act accountable to any one. That accountability is one of the indispensable elements of the offense.

The history of the English and American legislation on this subject, confirms this view.

The first legislation made servants who embezzled their masters' goods, liable:—21 *Hen.* 8 *c.* 7; 2 *Bish. Cr. L.* § 280. Subsequent legislation rendered clerks and agents, as well as servants liable: — 39 *Geo.* 3, *c.* 8; 7 *and* 8 *Geo.* 4, *c.* 29; 2 *Bish. Cr. L.* § 282. More recent enactments render certain officers employed by superiors, as well as clerks, agents and servants, liable: — 2 *Comp. Laws,*

§ 5771. It will be seen that the same general relation of service, and the same immediate accountability to a superior employer, exists in all these cases.

Other laws include other classes of persons, such as bank officers, carriers, &c.; but the statutes creating the offense in these cases usually define it, and prescribe what shall be sufficient proof of it.

The very fact that the Treasurer may change the funds in his hands, change the place of deposit, &c., during his term, only so that he have it in his power to pay as required by law, and the fact that he is not bound to pay over the particular funds received, but becomes indebted to the State in the sum he does receive as State Treasurer, and is liable only to repay to the State, shows that he can not be guilty of embezzlement: See 2 *Bish. Cr. L.* §§ 289, 305, 286 *and cases cited;* 11 *Met.* 64; 2 *Met.* 343; 2 *Rus. on Cr.* 176.

The word "officer" is therefore limited by the word "employed" in the same sentence. One out of the numerous examples of the same kind is found in the construction of the Massachusetts statute, in 3 *Gray*, 461. See also *Smith Com.* §§ 484, 637, 640, 651, 652; 2 *Bish. Cr. L.* §§ 286, 296; 5 *Denio*, 76, 79; *Dow. & Ry.* 22; *Dow. & Ry.* 19; *Mood. & M.* 21, *and* 3 *Wat. Arch.* 460-7 *and note.*

5. The Circuit Judge erred in charging the jury "that it was not necessary that the entire tax of the Detroit and Milwaukee Railway Company should be paid into the Treasury, before any part of it could be regarded as paid into the Treasury; but the payment of each installment as agreed upon by the Treasurer and the Railway Company, would be payment to the extent of such installment into the Treasury."

This charge is erroneous for two reasons:

(1.) The payment of an installment was not necessarily a payment into the Treasury, and in law could not be regarded as a payment into the Treasury.

*a.* Because the terms of the arrangement between Mr. McKinney and the Company were such that it could not be regarded as paid into the Treasury *at least* till all was paid, and not then unless Mr. McKinney fulfilled his trust to the Company.

*b.* Because the whole arrangement was wholly unau-thorized by law. It was a mere unofficial transaction, and was not in the line of official duty.

(2.) Whether paid into the Treasury of the State or not was a question of fact for the jury, and not of law for the Court; and the Court erred in regarding it as a question of law alone, and charging upon it as such.

6. The Court erred in charging the jury "that if the proper charge to the Treasurer of the moneys received should have been made in this county of Ingham, and that charge was not made, it would be evidence of embezzlement in this county: a denial in this county by the Treasurer of the receipt of the money would be evidence of embezzlement in this county."

First—It is submitted that where the proof shows that, if embezzlement *has taken place,* it *did actually* take place *in another county,* a denial in this county of the receipt of the money does not prove an embezzlement in this: — 1 *Wat. Arch.* 64, *n.* 1.

It is only in the absence of *express* evidence upon the subject, that a *denial* or failure to account can have *any effect* to locate the crime where the denial is made, or failure to account takes place: — See 1 *Wat. Arch.* (70) 69— 1; 2 *Russ.* 189.

Second.—It was error to charge that the mere omission of the accused to charge himself with the sum alleged to have been received, was evidence of embezzlement. An omission might have been for good reasons, or by mistake, &c. It is clearly not *evidence* of embezzlement:— 3 *Wat. Arch.* 455—2, *and notes, and* 456; *R.* & *Ry.* 267; 3 *C.* & *P.* 422; 3 *Wat. Arch.* 455—2 *n.* 2; 7 *C.* & *P.* 834, *R.* &

*Ry.* 402 ; 2 *Bish. Cr. L.* § 309, *and cases cited ;* 1 *Car. &
K.* 119 ; 2 *Russ. on Cr.* 181, 182.

A failure to *charge* is by no means like a *refusal* to
account.

7. The Court erred in this charge to the Jury ; "that
the money must have come into the State Treasury before
embezzlement could be committed.   That is, it must have
come into public funds—into the control and management
of the State Treasurer.   It was not necessary that the funds
should be in Lansing, but they should be in the Treasury
of the State.   Nor was it necessary that the funds should
actually have been received in this county, but it was
enough if it was in the Treasury of the State.   Nor is it
material whether the funds embezzled were at Lansing, or
Detroit, or New York."

The objectionable parts of this particular charge mostly
turn on the definition given by the Circuit Judge to the
term " *Treasury*" as used in this Statute, whereby moneys
are to be deemed as *in the Treasury* that are either under
the management and control of the Treasurer, no matter
where, or in what particular, or are of *the public funds* — no
matter what those funds may be, or where they may be.

See *Webster, Reid, Bouvier,* for definition of "Treasury."

In the statute itself the meaning is plain.   The Constitu-
tion provides that the Treasurer shall keep his office at the
seat of government.   His office is the Treasury of this State.

And this is the office in which the deputies and clerks
under the Treasurer are engaged in their employment.

If funds deposited in the Insurance Bank, Detroit, or the
Artisans Bank, N. Y., are in the Treasury of this State,
within the meaning of the word as used in said section 5771,
because *they are public funds*, or subject to the order of
the State Treasurer, then it would follow that said banks
are the State Treasury, and their officers and clerks included
in said section ; which is absurd.

Where money is deposited by the Treasurer in bank,

and a certificate of deposite, or other security, taken and lodged in the Treasury, the certificate or security is in the Treasury, though the money deposited is not; nor is the State entitled to that money, but only to reimbursement of it. The Treasurer may draw out and control it, but it is in the bank and not in the Treasury of the State.

Again, the locality of the money when embezzled must determine the venue, as we have seen. It was error therefore to charge that it made no difference whether the money was in Lansing, Detroit or New York, when embezzled. Even if it was not necessary for it to be in Lansing to be in the Treasury, yet if it was embezzled in Detroit or New York (confessedly so), it was not embezzled in Ingham county.

8. The Court erred in overruling the motion in arrest of judgment.

The first ground of the motion has already been considered. The three remaining grounds may be reduced to this one, viz:

That the money is not charged to have been in the Treasury of the State of Michigan at the time of the alleged embezzlement : nor is the act of embezzlement charged to have been committed in the State Treasury, and the information does not describe or· specify the money claimed to have been embezzled, or the act of embezzlement.

In the statute creating this offense the place of the act is an essential ingredient: a part of the description of the offense itself. The embezzlement must be committed in the Treasury of this State. It is not important for the purpose of this argument whether we consider the Treasury of this State as fixed at Lansing or not. It is plain there is such a condition as being in the Treasury, in opposition to being out of it: the information must, in stating all the facts and circumstances that constituted the statute offense, allege that the act of embezzlement was done *in the Treasury.*

THE PEOPLE *v.* MCKINNEY.

The case is similar to those under statutes in regard to arson in the night time, and larceny in a ship or dwelling house, and the like. In all these cases, notwithstanding the general allegation of time and place at the opening of the indictment, the special time or place is mentioned in connection with the essential words of the charge.

*C. Upson, Attorney General,* and *J. W. Longyear,* for the People:

1. The determination of the Court on the application for a bill of particulars is not the subject of revision on exceptions:—1 *Gray,* 466. It was a preliminary motion—a matter not arising on the trial—and rested in the discretion of the Court; and in all such cases the decision of the Court is not subject to review on bill of exceptions:—*Green's Prac.* 411, §§ 1215, 1216; 1 *Burr. Prac.* 239, 456; 1 *Doug.* (*Mich.*) 434, 448, 449; 5 *Mich.* 36, 43, 44; 4 *Cranch,* 237; 1 *Met.* 225; 4 *Pick.* 302; 5 *Pick.* 528; 11 *Pick.* 189; 22 *Pick.* 394; 1 *Cush.* 189; 3 *Hill,* 159, 432, 436; 1 *Denio,* 83; 15 *Wend.* 581; 3 *Mass.* 208; 6 *Pick.* 192, 193.

But under our present statute in relation to filing informations, where there has been a preliminary examination no necessity exists for making an order for a statement of particulars, and no injury could result to the respondent from the refusal to grant it. This case never was a proper one for any such order:—3 *Hill,* 194, 214.

2. The books in the Treasurer's office were proper evidence:—1 *Greenl. Ev.* §§ 483, 485. The acts of the deputy and clerks in making the entries, were done in the lawful discharge of their duties, and were the respondent's acts, and bind him in the nature of original evidence:—1 *Greenl. Ev.* § 113; *Rosc. Cr. Ev. p.* 54 (*5th Am. Ed. Phil.*); 29 *How. St. Tr.* 746.

3. The printed annual reports were also evidence:—1 *Greenl. Ev.* § 479; 1 *C. & H. Notes to Phil. Ev.* 335, note 147.

4. That the Treasurer is an officer, a public servant, employed in the Treasury of this State, seems not to admit of serious question; that he is within the mischief or evil to be guarded against is evident, and that he is as deserving of punishment, if guilty of embezzling, as any other officer or employee, will hardly be disputed, and we see no reason either in the letter, spirit, or policy of the statute, to exculpate or free him from the scope or effect of its provisions.

That he is comprehended in the provisions of this section is also apparent from several considerations.

(1.) The ordinary meaning of the word "employ." See *Webster*.

(2.) The words used in the statute are, "any officer." These words are broad enough, and must be deemed to include the Treasurer himself, unless their meaning is limited by the necessary implication of other words used.

(3.) The effect which a construction of the section, such as is claimed by respondent's counsel, would have upon the operation of the statute.

If the statute does not apply to the Treasurer, for the reason urged, that he is not an "officer employed," &c., then for the same reason it can not be applied to any officer in the State Treasury.

Aside from the Treasurer himself, there is but one other "officer" in that department known to the statutes, and he is the Deputy State Treasurer. But it can not be said that the Deputy is "employed in the Treasury" any more than the Treasurer himself; the only difference in this respect is that the one is elected and the other appointed. And such Deputy is invested with all the powers of the office during the sickness or necessary absence of the Treasurer, which necessarily includes the power to employ clerks, &c.

(4.) The reason of the statute.

The statute was made to prevent and punish frauds and

embezzlements of the public funds belonging to the Treasury, by persons having charge thereof. The reason of this provision applies to the Treasurer with equal, if not greater force than to his subordinates. The reason of a statute is a criterion by which to ascertain its true meaning:— *Smith on Stat. and Const. Law*, § 491.

5. We can see nothing objectionable in the charge respecting the payment to defendant of the Detroit and Milwaukee Railway tax. Payment of part of a tax may be made without payment of the whole, and be a good payment *pro tanto*. At all events, after having received the money as State Treasurer, in the manner set forth in the bill, defendant can not now disavow the act, or deny that the money so received by him was received into the State Treasury.

6. The third point in the charge excepted to has reference only to the question of venue, and was in fact given in response to a request of the counsel for respondent that the Court should charge that the embezzlement charged in the information must appear to have been committed in the county of Ingham.

The Court was instancing what acts were evidence, for the purpose of determining the venue in cases of embezzlement, and, if an embezzlement had been committed, to show what acts of the person charged with the offense would justify laying the offense in Ingham county. That if in the place where the person was in duty bound to charge himself with the reception of the money, he omitted so to charge himself with it, or rendered a false account, or denied there the reception of it, this was evidence, so far as the venue was concerned, that the offense of embezzlement, if committed, was consummated in that place or county, although the money embezzled might have been received elsewhere.

In general, the act of embezzlement can not be said to take place until the party who has received the money

refuses to account, or falsely accounts for it, and the not accounting has been held evidence of embezzlement, and also of the place where the embezzlement was committed, even when the money was received elsewhere:—*Rosc. Cr. Ev.* 446 and 449; 3 *B. & P.* 596; *Russ. & Ry.* 63 and 463; 1 *Chit. Cr. L.* 159, (192); 2 *Russ. on Cr.* 189, (216), 226 and 227; 2 *Bish. Cr. L.* § 314; 4 *Bl. Com.* (230) 182, note to *Chitty's Ed.*; *Whar. Cr. L.* § 1935; 8 *Eng. L. and Eq.* 577.

The Court in giving his charge was not attempting in this part to define the offense of embezzlement, nor was his attention then called to anything but the question of venue. The charge is to be taken and construed with other parts of the case in the same connection. No other questions can be considered by this Court, upon the exceptions, than those *particularly* raised below, because the case is not framed with reference to such questions. To any other part of the case the attention of the Judge who allows the exceptions is not called:—14 *Pick.* 370.

7. Another point in the charge excepted to, is in respect to the place where the money embezzled must have been before embezzlement thereof could be committed.

We see no necessity or propriety in locating the Treasury itself wholly at the office in Lansing, and it is a notorious fact that only a very small share of the public funds are kept there; and yet those funds belonging to the Treasury which the Treasurer keeps elsewhere under his control, are as much in the Treasury as the funds in the office at Lansing. If because those funds are kept elsewhere than at Lansing, they can be plundered by the Treasurer with impunity, then is the statute of very little practical use, and the Treasurer, by depositing the funds elsewhere, may be enabled to appropriate them to his own use and wholly escape criminal liability.

In order to sustain this exception it must be assumed that the State Treasurer can not legally receive state dues except at the particular place, building or apartment at

Lansing, known and designated as the State Treasurer's office, and that any payment made to him on account of such dues at any other place, is not in fact a payment, and does not discharge the obligation of the party making the same until the Treasurer has taken the money to his office at Lansing, and actually placed it in the vaults thereof.

It is evident that the word " Treasury," as used in section 5771, means the office or business of receiving, controlling, managing, safe keeping, and disbursing of the public funds, wherever they might be, and not the office or place, building or apartment, where the ordinary business pertaining thereto is done, and the books and papers relating thereto are kept. This is evident as well from the reason, object, and subject matter of the statute, as from the words " or in any *other* public office," following the word " Treasury," in the same section.

8. It is submitted that the decision of the Court on a motion in arrest of judgment can not be reviewed on bill of exceptions; and that exceptions not properly presented will not be regarded, even in criminal cases: — 15 *Wend.* 481; 3 *Hill,* 432 ; 2 *Chit. Genl. Prac.* 593; 1 *Cush.* 189. *And authorities cited in reply to first exception.*

It is insisted however, on the part of the People, that the motion in arrest was correctly decided.

CHRISTIANCY J.:

This case comes to this Court on exceptions, after verdict and before judgment, in pursuance of chapter 166 Revised Statutes of 1846 (*Comp. Laws, chap.* 197).

The information is based upon § 5771 Comp. Laws, and charges the defendant with having embezzled the moneys of the State while State Treasurer.

Exceptions were taken to the ruling of the Circuit Judge upon the admission of evidence, and to his charge to the jury. The jury returned a verdict of guilty.

A motion was made in arrest of judgment, on the ground that, for the several reasons urged, the information was insufficient to warrant a conviction, or to sustain a judgment against the prisoner. This motion was overruled by the Court; the defendant excepted, and the motion, the decision upon it, and the exceptions to that decision, are incorporated in the exceptions. All further proceedings were stayed in the Court below to await the decision of this Court.

It is insisted by the Attorney General that the questions involved in the motion in arrest of judgment, relating, as they do, to the information, or the *record proper*, can not be raised in this Court, upon the present form of proceeding, but only upon writ of error after judgment.

We see no ground for this objection. The whole record is certified to us, and required to be certified in this case substantially in the same manner as upon the return to a writ of error: it is therefore judicially before us, as well in the one case as the other, so far, at least, as to enable us to pass upon all questions raised by the exceptions, which is as far as necessary to go to dispose of all the questions raised upon the motion in this case. And it would seem from the decisions in Massachusetts, (from whose statute this chapter of ours is copied) that a motion in arrest of judgment is treated as a proper subject of exceptions under this statute:—*Commonwealth v. Dougherty*, 6 *Gray*, 349; *Commonwealth v. Sullivan, Ibid.* 477; *Commonwealth v. Cummings, Ibid.* 487; *Commonwealth v. Smart, Ibid.* 15.

But in the present case it is unnecessary to decide whether any question, not otherwise a proper one for exceptions, can be made so by a motion in arrest, and exceptions to the decision upon the motion: as we are all of opinion that the sufficiency of the information would necessarily have arisen had no motion in arrest been made. Exceptions are presented here upon the admission

of evidence and the charge of the Court. Without reference to the information, to see the nature of the offense charged, we could not understand, or pass upon, the exceptions. If the information upon examination be found to charge no criminal offense, or to be so defective in matter of substance as to warrant no conviction, or judgment against the prisoner, under any evidence or charge which might have been given, then *no evidence* could properly have been received, and it would be worse than idle for us to determine whether any *particular* evidence was properly admitted, or any particular charge wrongly given. No such question could then be properly involved in the case, and all we might say upon it would be extra judicial. Again, by the statute, *Comp. Laws, chap.* 197, § 6, we are to "give directions as to a new trial, or such other proceedings as right and justice shall require." For this purpose we must look to the information, to see whether it is sufficient to warrant the conviction, or *any further* proceedings; if not, a new trial would be a farce.

We must therefore inquire into the sufficiency of the information. It is claimed to be insufficient on four distinct grounds.

1st. That the State Treasurer is not included in § 5771 Compiled Laws, upon which the information is founded.

2nd. That the money claimed to have been embezzled is not charged to have been in the State Treasury at the time of its alleged embezzlement.

3d. That the embezzlement is not charged to have been committed in the State Treasury; and,

4th. That the information charges no offense within the section alluded to, or any law of this State.

All these points depend upon the construction of the statute in question; for it is not claimed that the information makes a case under any other statute. The language of the statute is, "If any officer, clerk or other person employed in the Treasury of this State, or in the treasury

of any county, or in any other public office within this State, shall commit any fraud or embezzlement therein, he shall be punished," &c.

The counsel for the defendant has urged, with great ability and ingenuity, that this statute was not intended to include the State Treasurer himself—that he, being a public, constitutional officer, the head of a department, the only security contemplated against his official misconduct is his official bond, and his only restraints a high sense of honor, liability to impeachment and removal from office; that it is unprecedented to render heads of departments liable to indictment for malversation in office—that in the phrase, " employed in the Treasury of this State," the term " employed," implies an employer, and must be understood in the sense of " procured to render service, as a master employs a servant,"—that, in this sense, it accords with the idea of embezzlement in other cases, which always supposes a relation of trust and confidence, as in the case of clerks and servants; and that it must therefore be understood here as applying only to subordinates in the office, employed by the Treasurer—that though the words are " officer, clerk or other person employed," the term officer is satisfied by the Deputy Treasurer, who is appointed by the Treasurer, and an officer authorized by the statute.

This argument is not without plausibility; but we do not think it will stand the test of a careful examination.

That the dictates of honor, a regard for reputation, the hazard of incurring public scorn and reprobation by impeachment, and a liability upon his official bond, would be a sufficient restraint upon a man who has been elevated to an honorable position of public trust, might to the moralist in his closet seem a well founded theory. But unfortunately it is a theory which has too often been found to yield to the force of temptation, here and elsewhere, to admit of universal application. It pre-supposes that none will be elevated to office who do not prefer an unspotted reputation

to ill-gotten gains; for official bonds are apt to prove as unproductive as official oaths. And, however experience may have warranted its application to other officers, such is the tendency of the public funds to create an "itching palm" that this theory can not with safety be applied to those officers who are entrusted with their custody and control. Such at least would seem to be the lesson taught by experience or suspicion, in at least six States of the Union; in each of which their statutes have very clearly rendered the State Treasurer himself, as well as other public officers, criminally liable by indictment, for embezzling the public funds. See the statutes of Pennsylvania, New Jersey, Mississippi, Texas, Wisconsin and Iowa, collected in note to *Arch. Cr. Pl. by Waterman*, 446, 447, &c. And doubtless the same will be found true of other States.

We do not think the term "employed," as used in our statute, can be restricted to the narrow sense contended for by defendant's counsel. It is true such is the sense in which it has been quite generally used in reference to embezzlement; but this we think has so happened, mainly because this crime always pre-supposes the offender to have come rightfully into the possession of the money or property, by reason of some position of trust and confidence; which is the principal feature distinguishing this offense from that of larceny. And the crime has been more frequently and generally provided for as to clerks, agents and servants, than as to public officers; and, as the former are so much more numerous, the offense has been more frequently committed by them. But the State Treasurer also occupies a position of trust and confidence, the only difference in this respect being that one is entrusted, confided in and employed, by a private person, or some officer or officers, the other by the public, by election or appointment.

The primary signification of the word "employ," is not that for which the defendant's counsel contends; the

primary meaning, as given by Webster, is "to occupy the time, attention and labor of; to keep busy or at work," &c., the sense which would here include the Treasurer. The sense claimed by defendant's counsel is the fourth given by Webster; "to engage one's services."

But little force, however, can be given to an argument drawn from the primary or secondary meaning as given by lexicographers. The only question is, what is the sense in which it is used in this statute? — and this is to be determined from the context, and the apparent object of the provision, as indicated by the nature of the case and other statutes in *pari materia*. As to the object — the mischief to be guarded against—we can see no satisfactory reason why the Treasurer himself, who has entire control of the funds, and therefore better opportunities and greater temptations to peculation, should not be held liable as well as the subordinates appointed and removable by him, and whose opportunities and temptation are less.

A history of the origin of this section, and the various phases through which it passed in the legislation of the State, till it assumed its present form, will, we think, satisfactorily show that the Treasurer was intended to be included. Its origin in this State (substantially copied from the Revised Statutes of Massachusetts) will be found in our Revision of 1838, p. 630, § 26 : "If any clerk or other person employed in the Treasury of this State." Here the word "officer" does not appear, nor does the section include the clause, "or in the treasury of any county, or in any other public office within this State."

But the Legislature of 1839 do not appear to have been satisfied with this provision, and, by amendment, added to a subsequent chapter, "That any public officer of this State (who) shall receive or be entrusted with the money or funds of the State, to be kept or disbursed for or on account of the State, and who shall expend or pay out such money or funds in any other manner, or for any

other purpose, than is or may be provided by law," &c., "shall be deemed guilty of a misdemeanor, and for each offense be punished," &c. : *Laws of* 1839, *p.* 233. This section certainly includes the State Treasurer. No deputy State Treasurer was authorized until the session of 1840.

Thus stood the law until the Revision of 1846. This Revision consisted mainly of a revision and consolidation of then existing laws. We have seen that the section now in question, in its original form in the Revision of 1838, was, "if any clerk or other person employed in the Treasury of this State :" the law of 1839 applied to " every public officer of this State who shall receive or be entrusted with the money or funds of the State, to be kept or disbursed for or on account of the State." In the Revision of 1846, this section does not appear as an independent provision, nor does the original section cited from the Revision of 1838 appear in its original form; but, in its place, we find the section in a new and amended form, the word "officer" for the first time appearing before the word "clerk," and the whole provision extended to "any officer, clerk or other person employed in the Treasury of any county or in any other public office within this State." We think this furnishes a strong and satisfactory inference of an intention to combine, in this section, substantially the effect of the original section in the Revision of 1838, and the amendment by the act of 1839, so far at least as to the persons intended to be included in its provisions. We are therefore entirely satisfied the State Treasurer is an "officer" included within this section in its present form.

We must therefore examine the other objections to the information.

To constitute the offense under this section, it is undoubtedly necessary, not only that the embezzlement should be committed by an "officer employed in the Treasury," but it must appear that the offense was committed "therein,"

that is, in the Treasury—for this is an essential characteristic of the statute description of the offense.

Before examining the several counts of the information, it will be proper to determine the sense in which the term "Treasury" is here used. It is insisted by defendant's counsel that it is to be understood merely in the sense of locality, as descriptive of the particular building (in this case the argument would confine it to the particular room, as there is no treasury building) within the walls of which the Treasurer keeps his principal office, or place of official business, at Lansing, and where the public moneys are kept (though we do not readily see why the Treasurer may not keep such office in one building and the money in another). The Court below seems to have understood the term in the sense in which it was evidently used in the old and the new Constitution: "No money shall be drawn from the *Treasury* but in consequence of appropriations made by law"—"No money shall be drawn from the *Treasury* for the benefit of any religious society;" and in the statute requiring the Treasurer to make an "annual report of the balance *in the Treasury* to the credit of the State:"—*Comp. L.* § 161: "the fiscal year of the Treasury:"—*Ibid.* § 163. "No moneys shall be paid out of the *State Treasury* except upon the warrant of the Auditor General:" *Ibid.* § 171; "charging the Treasurer the balance in the *Treasury*," &c.: *Ibid.* § 172. In all these cases the "money" and the "balance to the credit of the State" are manifestly regarded as being "in the Treasury" whenever and wherever it is in the official custody, or subject to the official control, of the State Treasurer in behalf of the State.

Let us see which is the more reasonable interpretation. That the Legislature intended this provision as a check to the rapacity of the "officers and clerks" who might be entrusted with the receipt, custody and disbursement of the public moneys, can not be doubted; and if the law required

all the public moneys to be at all times kept in the room or building known as the Treasurer's office, and did not allow him to place it elsewhere, or to have it in his possession, or that of his deputy or clerks, or under his official control, at any other place, there might be strong reason for the interpretation claimed by the defendant's counsel. But our laws do not require this. We know of nothing to prevent his receiving public moneys due to the State, if he choose to do so, at any place where he may happen to be; and he may certainly do so as to the sums received on loans made by the State, on the disposal of the stocks or bonds. He may take or send by his deputy, or a clerk (or transmit by draft) any amount of these funds where they may be required to be paid to the public creditors. He may place a portion of the funds in bank in such place as in his opinion the public interest or the convenience of disbursement may require. But in all these cases the money is just as much under his official control (and therefore as clearly in the Treasury), and just as liable to be embezzled by him, or his deputy or clerks who may be entrusted with its conveyance to or from the Treasury, as if it were in the Treasurer's office at Lansing; and we can see no reason why the temptation would not be at least equally strong. Can it be supposed the Legislature intended less carefully to guard it in such cases than when within the walls of the Treasurer's office? Clerks may often be entrusted with the reception of money out of the office, or with its conveyance to and from it. Did the Legislature intend to leave them at liberty to embezzzle it in such cases with perfect impunity, and to punish them only for embezzling it when within the walls, where they will have less opportunity and are more exposed to detection? For clerks are not included at all in the next section, nor punishable at all unless under this section. The next section (28 of the chapter) Comp. L. §5772, applies only to officers and agents of the State, who shall

refuse to deliver to their successors in office moneys, books, papers, &c., and punishes the offense by imprisonment not more than five years, or fine not exceeding five hundred dollars. Doubtless a State Treasurer might be prosecuted under this section after the expiration of his term, or his removal from office; but the punishment is less than one-half of that imposed under the previous section, § 5771, which is imprisonment not more than fourteen years, or fine not exceeding two thousand dollars. If the interpretation claimed by the defendant be correct, this section § 5771 will become the most inviolable of any provision to be found in our criminal statutes; for no Treasurer or deputy, however intent upon public plunder, will be likely to incur the risk of fourteen years in the State prison, and two thousand dollars fine, by embezzling the funds *inside the building*, when he can always have a better opportunity to perform the same financial operation *outside*, by incurring only the risk of about one - third of the punishment—and if a clerk, no punishment whatever.

We think the Circuit Judge was clearly right in his views of what was intended by " the Treasury" in this section, and that it was not intended to describe any particular place or locality; that, within the meaning of this section, money is " in the Treasury" whenever and wherever it is in the official custody of the Treasurer, or subject to his direction and control: and if he embezzle it while so in his official custody, or subject to his official control, it is an embezzlement in the Treasury. And a charge in an information of embezzling the moneys of the State, while in such official custody or control, is a charge of embezzling it in the Treasury. It would savor too much of verbal nicety to require a strict literal adherence to the very words of the statute (except perhaps in the use of words and phrases which have acquired a specific or technical meaning, and which of themselves express the very gist of the offense, as the word ravished in rape).

Nor do we think it necessary, under this statute, to charge expressly that the money was, by the defendant, "*received*" into the Treasury. It is sufficient if it show that the money *was* at the time in the Treasury, or in the official custody or control of the Treasurer, and the property of the State, without showing how it got there.

In view of these considerations, we are of opinion that the second, third, fifth and sixth counts of the information are sufficient, in the several respects mentioned. The other counts are more doubtful, and, for myself, I am inclined to think the first, fourth, seventh and eighth counts defective, in not showing, with sufficient certainty, that the embezzlement was committed *while* the money was in the official custody or control of the defendant; though its receipt by him into the Treasury is clearly averred.

But it is unnecessary to enter into a critical examination of the latter named counts; since the good counts are sufficient to sustain the verdict, and the judgment may be given upon them: — *People v. Shannon*, 5 *Mich.* 71.

The only objection urged under the fourth point, and not already disposed of, is that the information is fatally defective, in not specifying with certainty the particular kind of funds, whether gold, silver or, bills; or, if it was competent at all to dispense with this specification, then, at least, the sums charged to have been embezzled should have been identified by specifying the source from which they were received, so that it might at least be known whether the prosecution was for sums the receipt of which had not been credited, or others which had been credited and afterwards embezzled.

If it was necessary to *allege* either of these facts, it must be equally necessary to *prove* it, as nothing is required to be alleged which is not required to be proved: *Comp. L.* § 6054. If, therefore, it was necessary for the information to identify the particular money embezzled, by showing the kind of funds, or from whom received, it must

10 MICH.—G.

be because no conviction could be had under this statute without establishing such identity by the proof. The very able argument of the defendant's counsel upon the necessity of specifying the kind of funds, rests mainly upon the ground that, under statutes in reference to embezzlement by clerks, agents and servants of private parties, this particularity was held to be necessary, until statutes were passed dispensing with it; and that the only provisions of our statutes on this subject, are § 5945 Compiled Laws, which is confined to clerks, agents and servants, and § 6061, which applies only to the crimes of robbery and larceny.

We do not think this case falls within either of these dispensing provisions; but, on the other hand, we do not think it falls within that class of cases with reference to which they were held to be necessary. In the case of clerks, agents and servants of private parties, there is always a principal capable of scrutinizing the acts of those in his service, and whose private interest prompts him to vigilance, who has at all times power to direct and control the kind of funds to be received, and to change this direction at pleasure; and the custody or management which those in his service may have of his money or property is, in general, but momentary, or for a short interval, to be handed over to the principal from day to day or other short periods, or whenever he may choose to resume or assume its custody or management. The acts of such servant or clerk are generally performed under the direct supervision or control of the principal, who therefore has, or may at any time have, full and accurate knowledge of the character of the particular sums, and from whom received, and possesses facilities for tracing out the facts while transpiring or recent.

But these considerations do not apply to the State Treasurer; he has by law the entire custody and management of the public money, and may receive such description of funds as he chooses, being always accountable for cash;

the public at large can exercise no control or constant supervision over him, nor assume the direct custody of the funds; nor is any other officer or officers authorized to assume it, or to direct the funds to be received. Within the sphere of his legal duties the Treasurer is independent of all other officers and of the public; and, though bound to account to the Auditor General and to the Legislature, he is not required to state the kinds of funds received, or in his hands: these are constantly varying; large sums being often represented by drafts or bills of exchange, others by credits in bank, &c. And should he at any time embezzle or convert to his own use any of the public funds, it would, as a general rule, be wholly impracticable to trace or identify the particular pieces of money or bills, or to determine whether the sums embezzled were in the one shape or the other, or both; and it would be equally impracticable to show that any particular sum embezzled was the same money or funds received from any specified source or person; for, though the amounts might correspond, this would by no means establish their identity. And if the kind of funds received by the Treasurer in any particular instance, whether credited upon the books or not, could be identified as received from a particular source, the fact that this was not found in the Treasury at any subsequent time, would not prove that the same money had been embezzled; as this might have been honestly paid out to public creditors, and an equal amount embezzled in other species of funds, or those received from a different source.

We can not therefore suppose the Legislature intended to require proof of the identity of the money embezzled by the Treasurer, or of the kind of funds of which it consisted, or of the particular source from which it was received, without supposing they intended to render the provision they were enacting a dead letter. Such a supposition is inadmissible in reference to such a provision. The statute

must receive a more reasonable and practical interpreta-
tion, and one which shall be consistent with its manifest
purpose. This statute (unlike many others on the subject
of embezzlement) does not speak of the receipt of the
money. It makes no distinction between embezzlement of
sums which have been duly credited on the books of the
Treasury, and those which have not; nor can we perceive
any reason why such distinction should have been made.
Had it made such, it must, as already shown, have nulli-
fied the provision by the impracticability of the proof.
The offense created by the statute is the committing of
any embezzlement in the Treasury, not the neglecting or
refusing to account; the latter fact is mere evidence from
which the former is inferred. The information sets forth
the offense which the statute creates, and with as much
particularity as the nature of the case fairly admits. I
can not think it necessary to set out mere matter of
evidence. We must therefore hold the information sufficient.

It is further objected, that the Circuit Court overruled
a motion for an order requiring the prosecution to furnish
a bill of particulars, under the general charges contained in
the information.

Doubtless a general indictment for embezzlement is a
very proper case for enforcing a call for such particulars.
But the granting of an order for such particulars has, I
think, generally been regarded as a matter resting in the
sound discretion of the Court, depending entirely upon the
nature of each particular case as it appears to the Court
before whom the trial is had, and its refusal therefore not
assignable as error.

The order should never be refused where the Court
can see any reason to believe such particulars necessary to
inform the defendant of the particular transactions, or
instances of embezzlement, intended to be proved against
him, so as to enable him to meet them. And it is pos-
sible—though upon this I express no opinion — that there

might be cases where the refusal of an order might amount to so gross an abuse of discretion as to require us to recognize it as ground of error.

But no such abuse appears here; the prosecution was by information; no information could be filed without a previous examination for the offense before an examining magistrate (unless waived by the defendant): *Laws of* 1859, *p.* 393, § 8. This examination was required to be taken in writing and to be forthwith certified and returned to the clerk of the Circuit Court where the cause was to be tried: — *Comp. L.* §§ 5992 and 6001. Upon the order for particulars being moved for, the bill of exceptions states, "it appearing to the Court that a preliminary examination had been had, and the Attorney General having stated that he should confine himself to the same charges as in such examination, the motion was overruled." Now it would seem to be a fair inference from this language that the preliminary examination on file in the Court, was inspected by the Judge—that the examination showed the particular facts and transactions, sums claimed to be embezzled, &c., upon which the examination was had, as it naturally, if not necessarily, would. And the statement of the Attorney General, that he should confine himself to the same charges, was to be, and was understood as a statement that he should confine himself to the same items of receipt and embezzlement to which the preliminary examination related. This examination being in Court, must therefore have given, by reference, substantially the same information that could have been given by a bill of particulars; for, of course, it would be the duty of the Court to hold the Attorney General to his statement; the examination could be referred to for this purpose, and there is no complaint that the Attorney General went beyond the facts in reference to which the examination was had.

The particulars called for, if furnished, would not have constituted strictly a part of the information, nor any part

of the record proper; it would not have constituted the charges upon which the defendant was to be tried, as the defendant's counsel seem to suppose. Its only purpose and effect are to inform the defendant of the nature of the evidence and the particular transactions intended to be proved under the information, and to limit that evidence to the items and transactions stated in the particulars. The defendant was to be tried upon the information, and the verdict must be "guilty" or "not guilty, in manner and form as charged in the information," not "in manner and form as charged in said information and *bill of particulars*."

If given, the bill of particulars would no more constitute a part of the record proper than the statement of the Attorney General, and the examination to which it referred. Any of these might be made a part of the record by a bill of exceptions; none of them was a part of the record without it.

It was as easy to discover from the preliminary examination, whether the information was intended to charge a distinct offense in each count, as it would have been from the particulars called for. And in point of law there is no objection to charging several distinct offenses of the same nature, whether felonies or misdemeanors, in the same indictment. It is only upon the principle of the joinder of different offenses that several counts are allowed at all; though it is true several counts are generally inserted for the purpose of meeting the different phases of evidence of the same, or substantially the same, transaction. In many, perhaps most cases, it can not be certainly known from the face of the indictment alone whether the several counts refer to entirely distinct transactions, and are intended to charge separate and distinct offenses, or not. In such cases this point is only rendered certain by the statement or opening of the prosecuting counsel, or from the particulars where such are furnished, or by the evidence in the progress of the trial. But even when it appears clearly in any way that entirely distinct offenses are intended to be charged and

proved, it is no objection in point of law; neither ground for demurrer nor in arrest of judgment; and the only way in which the objection can be rendered available is by motion to quash, before defendant has pleaded, or at least before the jury are sworn, or by calling upon the prosecution to elect in the subsequent proceedings in the cause:— 1 *Chitty's Cr. Law*, 248, 249 *and* 253, *and authorities cited; Roscoe's Cr. Ev.* 231 *to* 234, *and cases cited.*

As a general rule, in cases of felony, when it clearly appears, from the indictment or otherwise, that several entirely distinct felonies are intended to be charged and proved, the Court will, in its discretion, either quash or compel the prosecutor to elect: and the same course is sometimes taken in misdemeanors where several offenses in no way connected are charged. But there is nothing technical in the rule; and in the exercise of this discretion the Court will not be governed simply by the question whether several different offenses in point of law are charged and intended to be proved; but mainly, as a general rule, by the consideration whether the trial of these several offenses would involve the proof of substantially different transactions, and thereby tend to confuse the defendant in his defense, or deprive him of any substantial right. And therefore where the several offenses charged, though distinct in point of law, yet spring out of substantially the same transaction, or are so connected in their facts as to make substantially parts of the same transaction, or connected series of facts, the defendant can not be prejudiced in his defense by the joinder, and the Court will neither quash nor compel an election. Such would seem to be the principle of the general rule to be deduced from the cases. See cases cited, 1 *Chitty's Cr. Law*, 253 *and* 254 *and notes; Roscoe's Cr. Ev.* 231, 232 *and* 233.

In the present case the information charges apparently several offenses of the same kind; and if the evidence related to several substantially different and distinct trans-

actions, it would have been a proper case for putting the prosecutor to his election. But from the bill of exceptions the evidence seems to show that all the charges grow out of, and relate to substantially the same transaction, and to make parts of one connected series of acts, and that it would be difficult to prove one of these charges without involving most if not all the evidence necessary to support the others. The arrangement with the Detroit and Milwaukee Railway Company, the reception of the money and the failure to account for the same — these constitute equally the basis of all the charges except the single small item received from the Michigan Insurance Bank; as between this and the other items of proof, perhaps the prosecutor might have been properly put to his election if requested. But I think it very questionable at least whether the prosecutor ought to have been compelled to elect as between any of the sums received from the Railway Company, had the Court been called upon for that purpose. But the Court was not called upon to order an election, and no such question arises.

It is also objected that the Court erred in admitting in evidence certain account books, proved to have been kept in the office of the defendant during his whole official term, and purporting to show all the receipts and disbursements of cash in said office during such official term, and from which it appeared that certain large sums, claimed to be embezzled, had not been credited to the State. It appeared from the evidence that no part of the books was in the hand writing of the defendant, but that they were kept by the witness, as his deputy, and by other clerks in the office. These books were objected to, on the ground that it did not appear they were kept by defendant in person.

We do not think this objection can be sustained. It was the official duty of the Treasurer to keep such accounts in his office; he might either make the entries himself or by his deputy or clerk; but in either case they were his

official acts; and if made by others for him, it was as much his duty to see that they were properly made, and the accounts correctly kept, as if all the entries had been made by himself. Of course the books would not be conclusive against the defendant; but the question is upon their competency. We think they were clearly competent; and if it appeared by the evidence that any particular sum which ought to have been credited to the State had not been so credited on the books, it was competent for the defendant to show that it was the error of the deputy or clerk, or that he had directed the entry and the clerk or deputy had neglected it, or any other fact which would show that the omission was not intentional on the part of the defendant, or for a corrupt or criminal purpose.

A similar objection was made to the admission in evidence of the printed reports (in pamphlet form) purporting to be the annual reports of the State Treasurer for the years 1859 and 1860 (the two years of defendant's official term), and to be published by authority, and printed by the State printer, and purporting to contain a statement of all the receipts and disbursements for each of said fiscal years; which reports were proved to have been made and published by direction of the defendant from the books of his office: from which reports it appeared that certain sums claimed by the prosecution to have been embezzled by him, had not been charged to the Treasurer (the defendant), and the same report for the year 1860, as printed and bound in the Session Laws of 1861, was also offered, objected to and admitted.

We think the objection to those printed reports quite as unfounded as that made to the books of account.

It was the official duty of the Treasurer to make these annual reports, and to cause them to be printed not only with the laws of the session of 1861—*Comp. L.* § 161—but also to have the same printed as soon as practicable after the close of the fiscal year (December 1st) and ready to

be submitted to the Legislature: — *Comp. L.* § 288 (this covers the case of the reports in pamphlet first offered), and to examine and correct the proof sheets : — *Ibid.* §289. *See also* §§ 290 *and* 291.

So far as the question of competency is involved, all these printed reports were as much original official documents as the manuscripts from which they were printed would have been under the signature of the defendant. If there was any mistake in the printing it was competent for the defendant to show it, or any other proper matter of explanation or exculpation.

We now come to the exceptions to the charge. The first point of the charge excepted to relates only to the question whether the Treasurer is included in the section upon which the information is based, and has been disposed of in considering the sufficiency of the information.

The second point of the charge excepted to is, that "it was not necessary that the entire tax of the Detroit and Milwaukee Railway Company should be paid into the Treasury before any part of it could be regarded as paid into the Treasury: but that the payment of each installment as agreed upon by the Treasurer and the Railway Company would be payment, to the extent of such installment, into the Treasury."

All the testimony stated in the bill, so far as it bears upon the question (and upon this there seems to have been no conflict), shows that by the arrangement with the Railway Company, the Treasurer, in June, before the tax became due, received of the company six drafts drawn by the Secretary of the Company upon their Receiver, and accepted by him, payable at the Metropolitan Bank, in the city of New York, respectively on the first days of August, September, October, November and December, and on the twenty - fifth day of December, 1860 — all after the tax became due. The defendant, as State Treasurer, endorsed these drafts in June, 1860, had them discounted at the Artisans

Bank in the city of New York (where he had a large amount deposited as State Treasurer), and the amount placed to his credit in his official character. The drafts were paid as they respectively matured. Now it is doubtless true that the reception of these drafts did not amount to payment; nor did the discounting of the drafts and the placing of the amount to the credit of the State Treasurer in bank. The drafts as they became due might fail to be paid: if not paid, they would be charged back to him on his bank account as they respectively became due and were dishonored; until payment therefore the amount of each draft was subject to this contingency. But as each of the drafts was successively paid, the amount so paid ceased to be, subject to any contingency, became an absolute credit to him in bank as State Treasurer, and operated as a payment of so much into the Treasury, precisely as if the same amount of money had been paid by the Railway Company directly into the hands of the Treasurer. And it will hardly be contended that such direct payment in several portions or installments would not be good, if the Treasurer saw fit so to receive it, merely because the whole had not been paid at once and a receipt given.

It is undoubtedly true that the State was not bound by this arrangement, until, or any further than, actual payments were made. But whether the State had or had not the power to repudiate the whole transaction after payment was actually made, is a question we do not think it necessary to decide. We are satisfied they were not *bound* to repudiate it; and there certainly is no evidence that they did: and we think it quite clear the Treasurer himself could not repudiate it after thus receiving payments, at least to the extent of the payments so made. The money had been obtained by him on the faith of his official character, and *in the right* of the State: he had no pretence of right—nor does it appear that he made any—to demand or receive it otherwise: it was placed to

his credit as Treasurer, and therefore to the credit of the
State, in bank. After having thus obtained the money by
virtue of his office, and placed it to the credit of the State,
there is no ground for the pretence that he obtained or
held it as the agent of the company.

It is further objected to this portion of the charge,
that it assumes to decide what the agreement was between
the Treasurer and the Railway Company in respect to the
mode of payment: whereas that question belonged to the
jury. We do not think the charge is fairly open to this
objection. The whole charge does not purport to be given,
and the merely incidental manner in which the agreement
is here alluded to will not authorize us to infer that the
question, what the agreement was, had not been left to
the jury, or was intended or understood to be taken from
them. The evidence tending to show what the agreement
was, so far as the exceptions show, was wholly uncon-
tradicted. If the defendant was not satisfied with the
mode in which this agreement was thus incidentally alluded
to, he should have called the attention of the Court speci-
fically to the point by a request to charge, so as to give
the Court a chance to correct it, since the imperfection,
if any, was such as would be likely to escape the atten-
tion of the Court upon a general exception. But we think
the fair understanding of the charge in this respect, is that
if the jury should find payment had been made, as the
evidence tended to show had been thus agreed upon, the
payment of each installment would, in law, constitute a
payment to that extent into the Treasury.

The third point or paragraph of the charge excepted
to, is in these words: "That the embezzlement must have
been in the county of Ingham. If the proper charge to
the Treasurer of the money received would have been
made in this county, and that charge was not made, it
would be evidence of embezzlement in this county. A
denial in that county (Ingham) by the Treasurer of the

receipt of the money, would be evidence of embezzlement in that county."

It is quite manifest, we think, that the Judge was not here attempting to define the offense of embezzlement, nor to enumerate all the elements necessary to constitute it: but that this portion of the charge relates entirely to the question of the venue of the offense, and what facts it was competent for the jury to consider in connection with that point. And we must not lose sight of the fact that the bill purports to set out but a part of the charge, and does not purport to set out all the evidence. It would therefore be unreasonable to infer that the Judge had omitted the plain duty of defining the offense, and the elements necessary to constitute it, simply because this portion of the charge relating to the evidence of venue does not contain such definition and enumeration. The more natural inference is, that this duty had been performed, and in a manner satisfactory to the defendant's counsel; as no exception is taken on that ground, but to the charge in reference to the evidence bearing upon the question of venue. We are not therefore satisfied that this portion of the charge ought to be, or was, understood as saying to the jury that the failure to account would, of itself, constitute the embezzlement, or that it would alone be conclusive, or even sufficient to establish that fact; but rather, I think, that it would be evidence which they might consider, with any other evidence in the cause tending to establish that fact; and in this view the charge was entirely unobjectionable: and upon the question of venue I concur entirely with the views expressed by my brother Campbell. A refusal to account necessarily involves an omission as one of its elements; the omission is therefore competent, though other facts may be required to make it equivalent to a refusal.

But the Judge, after mentioning the failure or omission as evidence, immediately adds: "A denial in this county

by the Treasurer of the receipt of the money, would be evidence of embezzlement in this county." This last clause or proposition would, I think, be entirely unexceptionable in any view of the charge, and whether considered alone or in connection with the preceding; since it would as clearly show a criminal intent as the most direct refusal to account. Nothing appearing to the contrary, we must presume there was evidence in the case to which the last proposition related—evidence tending to show a denial in that county of the receipt of the money. Every part of the charge must be presumed to be correct, and to be warranted by the evidence, so far as the bill does not show the contrary:— 2 *Phil. Ev. by Cowen, Hill & Edwards,* 1003 *and* 1004 *and cases cited.*

What the Judge may have told the jury would be evidence of embezzlement, or would tend to show it to have been committed in that county, we have no means of knowing. But where a Judge enumerates several facts, and informs the jury that each would be evidence of a certain other fact, it would seem to be a fair inference that he intended the jury to consider such several facts together, and not each independent of the others; much less, that each would, by itself, be sufficient proof—unless the language will admit of no other reasonable construction; because the charge must be understood by the jury as having reference to the collective evidence upon those points in the case before them, and to the combined effect of all. We think it therefore reasonable to conclude, that both clauses or propositions of the charge were intended to be considered together, and not independently of each other, and that they were so understood by the jury. Thus understood the charge would, we think, be clearly right, and sustained by the uniform current of authorities, whether he meant to say it would be sufficient, or only competent, to show the embezzlement in that county.

But had the charge expressly made the failure to

account in this case equivalent to a refusal or willful failure to account, and therefore sufficient proof of embezzlement (which I think it did not), I am by no means satisfied the charge would have been erroneous; for it must have then been understood to apply to the failures which the evidence in the case tended to show; and upon these there does not appear to have been any conflict. The statute defining the duties of the Treasurer required him to exhibit to the Auditor General, monthly, a true account of his receipts, and to make an annual report of such receipts to the Legislature:—*Comp. L.* §§ 160 *and* 161. He is sworn faithfully to perform the duties of his office. Four several payments of four thousand dollars each had been made to him, at the interval of as many successive months, before his annual report was made; and yet it appears clearly that not one of these payments had been credited to the State, or charged to himself on the books of the Treasury; it was his duty to enter each as it was made; yet no attempt appears to have been made to explain this omission. The reason why a mere failure to account is not generally sufficient evidence of the act of embezzlement, is because it may have occurred through mistake and without a fraudulent intent. A single payment might have been omitted by mistake—perhaps two in succession, if the sums were insignificant; hardly four of four thousand dollars each, on as many different months, and all from the same source. Mistakes do not occur upon system; and it may well be doubted whether these repeated and systematic failures should not be considered in the same light as a refusal or willful failure to account. I am inclined to think they should be so considered, as equally tending to show a criminal intent. Hence in whatever light the charge was understood, I can not think the jury could have been misled to the prejudice of the defendant.

But it is further objected to the whole of this charge on the subject of venue, that proof of a refusal to account,

or a denial of the receipt, in the county where the trial
is had, is not sufficient to prove the offense in that county,
when the proof shows that the embezzlement, if any, must
have taken place elsewhere. This may be true, but we do
not see how this objection applies to the present case. No
such evidence appears in the case as stated, nor any thing
from which the jury could have drawn such an inference.
Had there been such proof, as the burden of showing error
rested upon the defendant, it would doubtless have been
stated in the bill.

The fourth and last paragraph of the charge excepted
to relates partly to the venue of the offense, and partly to
what constitutes the State Treasury.   So far as it relates
to the first · (with  the exception of a single consideration
which will be presently noticed) it has been sufficiently con-
sidered under the preceding paragraph relating to the same
subject.  So far as it relates to the second—the Treasury—
the objection has been fully answered in considering the
sufficiency of the information.

But one consideration in reference to venue was strongly
urged upon the argument as conclusive against the correct-
ness of this fourth point in the charge.   This portion of
the charge assumes that it was not necessary the money
should have been in the county of Ingham, to warrant the
jury in finding that defendant embezzled it in that county.
"How," (the counsel asks) "could the money have been
embezzled in that county if it was not there at the time?"
We have already shown that, under this statute, money is
properly regarded as being in the Treasury whenever and
wherever it is in the official custody or under the official
control and direction of the State Treasurer, for the use of.
the State.   Any act or series of acts on his part, by which
the money should be taken or abstracted from the Trea-
sury, or diverted from the use of the State, with intent to
apply or appropriate it to his own use or benefit, would
constitute embezzlement.  The whole force of this objection,

therefore, rests upon the assumption, that the Treasurer could perform no act by which the money could be thus abstracted or converted to his own use or benefit, unless at the time of the act he were personally present where the money happened to be. This assumption is so manifestly unfounded in law or fact as to require no comment.

We think the Court below should proceed to give judg· ment upon the verdict against the defendant.

MARTIN CH. J. and MANNING J. concurred.

CAMPBELL J.:

As I have come to a different conclusion from my brethren upon the sufficiency of the information, I shall very briefly refer to some of the other points raised, and then give my views upon the questions involved in that. And in this I shall in the main preserve the order of argument on the hearing.

It was urged as error that the Court refused to order a bill of particulars of the matters to be relied on by the prosecution. Had this been an indictment instead of an information, the question would have been a very important one. But as an information can only be filed after the party has had an opportunity for a preliminary examination, and as that was had in this case, there can be no occasion for anything more. The examination must be filed· in Court, and no bill of particulars could be more complete. The introduction of any matter not covered by it would I think be good ground of objection and exception. It was so decided in *Commonwealth v. Giles*, 1 *Gray*, 466, although in that case the Court were inclined to think the original granting of particulars discretionary —a matter upon which I shall reserve my opinion until a case arises to call for it.

In regard to the account books and printed reports admitted, I think they were competent evidence. It was

10 MICH.—H.

the legal duty of the defendant to see that all transactions were properly entered. By showing the existence of facts not entered, the prosecution certainly took one step towards making out their case. A neglect to have entries made was an omission of duty, or at least an apparent omission, which might or might not be criminal, but which certainly should go to the jury with the other facts. The printed report was also a document which he was by law bound to prepare, and which should have contained a true account. An omission to include any material item here, as in the books, would be a very pertinent fact for the jury. The objection that the original written document should have been produced, is of no force. State documents published by authority are always receivable, and are the most convenient means of proving the contents of the originals, which public policy requires to be kept in the office, and therefore renders it competent to prove by copies. *Watkins v. Holman's Lessee*, 16 *Pet.* 25; *Gregg v. Forsyth*, 24 *How.* 179. If in any way variant from the original the variance may undoubtedly be shown, and so might honest mistakes in that be explained.

The principal question, apart from the sufficiency of the information, is whether the statute was designed to reach the State Treasurer. That he is an officer employed in the Treasury—in the ordinary acceptation of the term— is plain enough; but it is urged that, from his high position, and the nature of his powers, it is not presumable that any but his own employees were within the mischief to be redressed. The legislation of this State has been sufficiently reviewed by my brother Christiancy, and I shall not repeat his arguments. The ground of exemption from responsibility to the ordinary criminal process, chiefly relied on, was that an impeachment is the appropriate remedy for the official misconduct of high officers of State.

If our system continued to operate in all respects like that of England, perhaps this objection might prevail. But

the House of Lords in trying impeachments is regarded as a Court of criminal jurisdiction, and not as a legislative body. It tries as a Court the impeachment which is presented by the Commons, as the most solemn grand inquest of the Kingdom: — 4 *Bl. Com.* 259; 2 *Hale P. C.* 150. The cause is tried substantially as in other courts, and judgment is given of fine or imprisonment as well as of disability: — 4 *Bl. Com.* 121. When Mr. Burke in Hastings' case asserted that the House of Lords need not follow the rules of evidence received in the ordinary criminal courts, he was overruled by the unanimous opinion of the Judges. And the judgment must also be such as is warranted by legal principles or precedents: — *Western's Com.* 114. [There is therefore no occasion in England to resort to any further remedy for complete justice.

Our Constitution declares that "*judgment in case of impeachment shall not extend further than removal from office.*" This would of course preclude any impeachment of a person out of office, and, if no other remedy were provided, would save a delinquent in office from any penal consequences. But in taking away the power of adequate punishment from the Senate, it is expressly declared that "*the party convicted shall be liable to punishment according to law:*" *Art.* 12, § 2. Instead therefore of being an argument against extending the statute over State officers, the change from the English system to our own renders it necessary to make some such provision, in order to accomplish, under our laws, what is done in England by impeachment alone. And, where the offender is out of office, no question can arise concerning the priority of prosecutions. Inasmuch as the language of our statute fairly covers the State Treasurer, I think there is no rule of public policy which can reasonably be supposed to exempt him from liability under it.

I am also of opinion that he would be liable under the statute for embezzling any moneys officially received by him, and that the moneys shown upon the trial to have been so

received, were lawfully in his hands as State Treasurer, and in no other capacity. Had the information been good in other respects, I think the conviction would have been. But as I do not place my objections to it upon this question of a want of averment concerning the Treasury or its location, I shall not consider that particular objection as applicable to any of the counts. Some of them certainly are good, so far as that special objection goes.

Nor do I think the charge of the Court erroneous in directing the jury that the omission to charge the Treasurer in Ingham county with the moneys received would be evidence of embezzlement in that county; and that a denial of its receipt there would be evidence of embezzlement in that county. When the whole case is examined it is plain the jury could not have understood the charge as construing those acts into conclusive evidence of guilt, and could not have been misled by it in any way. The evident bearing of it was merely upon the venue. And I am very strongly inclined to the opinion, that where a public officer is bound to have his office in a certain place, and to keep his accounts there, an official embezzlement may always be charged in law to have been committed there—at least when it is of money unaccounted for. He is bound to account there, and until he fails to do so there can usually be no proof of embezzlement. The receipt of money may be abroad as well as at home, and yet no one could question his official responsibility to his own State on that account. Such offenses can often have no ascertainable locality; and must to a certain extent be governed by a constructive one.

I have referred to the principal questions arising on the merits, because they have necessarily been decided by my brethren, and I concur in the conclusions at which they have arrived on these points. And it is with much regret that I am compelled to differ upon a question of pleading. But as I deem the defect a substantial one, and depending on rules vital to the administration of justice, I can not

concur in the result, although no injustice may have been done in this particular case by the violation of the rules. If the legal rights of a defendant have been denied, the facts are not material.

I do not think the information contains any such description of an offense that the defendant was legally called upon to meet it.

The law permitting informations to be filed, declares that "*the offenses charged therein shall be stated with the same fullness and precision in matters of substance, as is required in indictments in like cases.*" "And in all cases a defendant or defendants shall have the same rights, as to all proceedings therein, as he or they would have, if prosecuted for the same offense upon indictment:"—*L.* 1859, *p.* 392.

It is not claimed by any one that we have any statute which would make an indictment good for the offense charged here, which would not have been good under the common law rules of pleading. I do not refer to mere matters of form, although they may be such as a party can rely on. Impeachments—which were the common law accusations for such offenses—were not required to be technical; and substantial accuracy is all that I shall consider. That was required in all proceedings and in all courts.

In order to ascertain the necessary elements of an indictment under this statute, we must first determine what constitutes the crime. No crime is defined by the statute itself. But it punishes certain classes of acts which we must look elsewhere to understand. It declares that "If any officer, clerk, or other person employed in the Treasury of this State, or in the treasury of any county, or in any other public office within this state, *shall commit any fraud or embezzlement therein, he shall be punished, &c.*

The term *embezzlement* does not seem to have had any technical meaning at common law, and · has been used to signify every kind of stealing. But when used in statutes

it has almost, if · not quite, universally been confined to the misappropriation of property, by those to whose care it has been confided as officers or agents. And in this sense it has no technical application — so far as I have been able to ascertain — to any specific kind of personal property. It is not possible under a statute so broad as ours to confine it to any variety out of the numerous valuables which are entrusted to official custody. And there must be very many kinds of embezzlement which may be committed by a State Treasurer. Without undertaking to go into the subject further than is necessary to explain my views on this case, there are various ways in which he may embezzle public funds. He may, as he is claimed to have done in this case, receive moneys for the State and use them without accounting for them. · Or he may draw from the Treasury moneys with which he stands charged, either by taking out cash on hand in his vaults with a design of converting it to his own use, or by drawing money in his own favor, or by paying fraudulent accounts with the same unlawful design. The law, of necessity, assumes that whatever offense any one may be charged with may be falsely charged; and it likewise, in all· cases, presumes innocence until guilt is shown. And it is a further principle, not only of the common law but of the Constitution, that every person has a right to be informed of the nature of the accusation against him. This information is contained in the indictment or other instrument of accusation, which must set forth the offense, and to which all the evidence offered must be conformable. "The charge must contain a certain description of the crime of which the defendant is accused, *and a statement of the facts by which it is constituted*, so as to identify the accusation, lest the grand jury should find a bill for one offense, and the defendant be put upon his trial in chief for another, without any authority. These precautions are also necessary in order that the defendant may know what crime he is

called upon to answer, and may be enabled to claim any right or indulgence incident to the prosecution of some crimes; as treason, &c.; as well as that the jury may appear to be warranted in their conclusion of "guilty or not guilty" upon the premises to be delivered to them; and that the Court may see such a definite offense on record, that they may apply the judgment and the punishment which the law prescribes; they are also important " *in order that the defendant's conviction or acquittal may insure his subsequent protection, should he again be questioned on the same ground;* and that he may be enabled to plead his previous conviction or acquittal of the same offense in bar of any subsequent proceedings:"—1 *Chit. Cr. L.* 169, 170. And in laying down the general rules which determine the sufficiency of indictments, Mr. Chitty says, "the facts of the charge must, except in the two instances above mentioned, of proceedings against common scolds and barrators, be so set forth *on the record,* that the defendant may clearly understand the charge he is called upon to answer, that the Court may know what judgment is to be pronounced upon conviction, *and that posterity may know what law is to be derived from the record:"*—1 *Chit. Cr. L.* 231.

There is not a single count in the information which sets forth any facts describing, or constituting the offense which was sought to be proved against the defendant. He is charged with what is rather a conclusion of law than a fact. The charges as set forth are just as applicable to money received from the Central or Southern Railroad as from the Detroit and Milwaukee. They would apply as well to money received from State bonds, or taxes, or land sales, or any other of the numerous sources of State revenue, as from either. They would apply as well to money once accounted for, as to money never entered. In short, if the counts are good, there is not a single dollar ever received by the Treasurer which he

may not under this information be convicted of embezzling. And yet every separate sum received from different sources, and not accounted for, would be the ground of a separate offense.

It was urged with much force that it would be impossible to allege every fact with particularity where a defendant must have the only evidence of many matters done in secret. As for example, the precise kind of money stolen, the number and designation of the bills, and the like. How far this difficulty may exempt a prosecutor it is unnecessary now to say, for the defects here are not of that character. The law must in all cases require as complete a description of the offense as its nature fairly admits of. It makes no great difference, perhaps, if a sum of one thousand dollars is received, of what particular bills it is composed. A fund is not changed by the substitution of one kind of money for another. But if a person is charged with not accounting for money received, it is important for him to know from whom he is alleged to have received it, and for what purpose, because if innocent he may be prepared to overthrow the proof of any such payment.

There is no real difficulty in alleging every substantial fact. No indictment can be found except upon lawful evidence, and no defendant can be properly convicted except upon lawful evidence of every such fact. The chief evidence upon which this conviction was obtained consisted of proof that certain moneys had been paid by the Detroit and Milwaukee Railway Company to the State Treasurer and never accounted for. And every embezzlement of this description must require similar proof. Had the charge been designed to cover money accounted for and subsequently embezzled, the proof would have consisted of such admitted amount on hand, and a subsequent deficiency, or an actual subsequent taking or misappropriation; and such other facts as would show the felonious design.

There is no rule of convenience or propriety which can make it improper to require a party to allege, in substance, all he would be absolutely bound to prove before he can recover a judgment or maintain a conviction. And every prosecutor must of necessity know before hand what charges he expects to rely on.

The statutes which have authorized general allegations in criminal pleading have only led to a necessity in many cases of supplying what they ought to allege by a bill of particulars; and they have been very justly condemned. Over technicality is not to be favored, but substantial accuracy is required by both justice and convenience. As an information must be as perfect as an indictment in all substantial particulars, and as there has been no statutory relaxation of the common law which can apply to this case, it must be determined by the common law rules.

I think the information fatally defective, as not describing any crime with reasonable certainty.

I am of opinion therefore that no judgment can properly be entered, and that judgment should therefore be arrested.

*Judgment to be entered on the verdict.*