### PEOPLE v. ALLAN.

CRIMINAL LAW—BANKING LAWS—EMBEZZLEMENT—CHARGING DIF-FERENT OFFENSES IN ONE COUNT.

- Conviction of violation of banking law, charged in one count, that defendant did ''wilfully and feloniously embezzle, abstract, and misapply certain moneys, funds, credits, and property'' of bank, of value of certain amount, and convert same to his own use, with intent to injure and defraud bank, is affirmed, on appeal, by equally divided court (3 Comp. Laws 1929, § 11963).

Appeal from Recorder's Court of City of Detroit; Skillman (W. McKay), J. Submitted January 25,

1933. (Docket No. 134, Calendar No. 36,313.) Decided May 16, 1933. Rehearing denied June 29, 1933.

Robert M. Allan was convicted of violation of the banking laws. Affirmed by an equally divided court.

*Thomas F. Chawke* and *Arthur Schueler,* for appellant.

*Patrick H. O'Brien,* Attorney General, *Philip H. Robinson,* Assistant Attorney General, *Harry S. Toy,* Prosecuting Attorney, and *Chester P. O'Hara* and *Edmund E. Shepherd,* Assistants Prosecuting Attorney, for the people.

SHARPE, J. The information filed in this case contained five counts. The last four were eliminated under the circumstances hereafter referred to. Conviction was had upon the first count and sentence imposed thereon, of which the defendant seeks review by appeal.

In this count it was charged that the defendant as president, director, and agent of the American State Bank, a Michigan banking corporation, did "wilfully and feloniously embezzle, abstract, and misapply certain moneys, funds, credits and property" of the said bank of the value of $106,565.39 and convert the same to his own use, with intent to injure and defraud the bank. This count was framed under 3 Comp. Laws 1929, § 11963.*

On arraignment the defendant refused to plead, and a plea of not guilty was entered by the court. A bill of particulars of the items making up the said sum of $106,565.39 was demanded and furnished.

---

\* See Act No. 328, Pub. Acts 1931, § 180.

The defendant was elected president of the American State Bank in January, 1929. He had been in its employ since his graduation from the law department of the University of Michigan in 1918, and a director since 1924. He resigned the presidency on March 9, 1931. In May, 1929, there was discussion between the defendant and Frank H. Dohany, an attorney and one of the largest stockholders of the bank, but not then a director, about the wisdom of organizing a securities or investment company as a subsidiary of the bank. A plan therefor was worked out by them and submitted to the board of directors on July 30, 1929, who adopted a resolution recommending that a special meeting of the stockholders be held on August 6, 1929—

"for the purpose of voting upon an increase in the capital stock of this bank from $1,500,000, to $2,000,000, represented by 100,000 shares of $20 par value stock, and that $500,000 shall be added to the capital account and $750,000 to the surplus and undivided profits account.

"Be it further resolved, that a securities company shall be formed known as the American-Detroit Company with a paid-in capital of $375,000 represented by 100,000 shares of no par value stock and the beneficial interest of such stock to be held by the trustees for the benefit of the holders of bank stock, and that such beneficial interest shall be noted upon each security of bank stock outstanding.

"Be it further resolved, that the board of directors hereby recommend to the stockholders that the above unit of shares shall be sold to stockholders of record at the close of business. August 6, 1929, at $65 per unit share on the basis of the right to purchase one share of the new unit stock for every three shares of bank stock then outstanding.

"And be it further resolved, that negotiable rights shall be issued and that the stockholders having the

ownership of said rights shall pay for the new unit of shares on or before September 30, 1929, at which date all rights will expire."

The stockholders met on August 6th. The minutes show that the defendant explained the purpose of the meeting, after which the resolution adopted by the directors at their meeting on July 30th was read and adopted by the unanimous vote of the stock represented. The stockholders then, also by unanimous vote, appointed John J. Barlum, Charles P. Larned, Frank H. Dohany and Fred J. McDonald—

"to represent them and enter into a contract with the trustees regarding the holdings of the stock of the American-Detroit Company for their beneficial interests"

in accordance with a contract, a copy of which was set forth at length therein, to be executed between the stockholders above named for themselves and all the stockholders of the bank and Robert M. Allan, Gordon Fearnley, Joel Stockard, and George M. Welch, as trustees for themselves and all the stockholders of the American-Detroit Company. It provided:

"(b)   There shall be deposited with the trustees and there shall remain on deposit with them as long as the trust hereby created continues, the certificates of stock representing all of the shares of the present or future capital stock of the American-Detroit Company, except qualifying shares of directors.

"(c)   The trustees may unanimously agree with the consent of all parties to this contract at any time to increase or decrease the capital stock of the American-Detroit Company; amend, extend, or renew their several charters; and shall, during the life of this trust have all the rights, powers, and privileges of absolute owners of all of the stock of the

American-Detroit Company, except that all dividends shall be paid to the committee representing the stockholders of the American State Bank of Detroit at date of payment.

"(d)   It is understood that each share of the American State Bank of Detroit stock shall have a notation upon it showing the beneficial interest in one share of the American-Detroit Company.   The trustees do hereby agree to hold the stock as trustees for the beneficial interest in ratio to the outstanding shares of the American State Bank of Detroit, as shown by the stock books of the American State Bank of Detroit.

"(e)   It is also agreed that no beneficial interest in the stock of the American-Detroit Company shall be capable of being severed from the stock of the American State Bank of Detroit or its successor.

"(f)   Trustees do hereby agree that they will not transfer, assign, or in any way hypothecate stock standing in their name, unless by written direction of all parties to this contract.   It however being agreed that the successor of any party to this contract shall be termed as an original party for the purpose of transfer or disposal of stock held by the trustees."

The minutes of the meeting further show:

"On motion by Frank H. Dohany, supported by Nelson J. Dessert, the action of the committee in entering this general depositary agreement was ratified and an unanimous oral vote was cast."

After this meeting Mr. Dohany was instructed to prepare the necessary instruments for the organization of the American-Detroit Company under the general corporation act.   He did so, inserting the names of all of the directors of the bank, except two, as directors.   He prepared a waiver of notice of the first meeting of the stockholders, and the proposed

minutes thereof, and a suitable set of by-laws for adoption. He also prepared a petition to be executed by those who became officers of the company, to be forwarded to the treasurer of the State, on which to obtain a license to do business. He delivered all of these papers to his secretary, Julia Manly, with instructions to take them to Gordon Fearnley, the vice-president of the bank. Miss Manly testified that when she went to the bank Mr. Fearnley was busy and she gave them to his secretary, Miss Clark, and told her they were for Mr. Fearnley. Miss Clark was not sworn as a witness. Mr. Fearnley testified that he had not ''the slightest recollection of ever having seen those papers;'' that if he had received them he would have had them executed. He also testified that the first intimation he had that the company was not incorporated was when he and the defendant were so informed by a bank examiner in February, 1931. These papers were not thereafter accounted for in any way, and no proceedings were thereafter had relative to the organization of the American-Detroit Company.

The company, however, began to function, under the control of the defendant and Fearnley. The stockholders began paying in on their purchase of the additional stock. This was placed by Fearnley in an account headed ''New Capital Account.'' On September 26, 1929, a deposit slip of the bank, crediting the American-Detroit Company with $375,000, was made out. This had the O. K. of the defendant upon it, and by it this sum was deposited in the commercial account of the bank to the credit of the American-Detroit Company.

The American State Bank at that time had a number of branch banks in the city, and one of the purposes of the proposed organization of the Amer-

ican-Detroit Company was to secure stock in and give the bank a working interest, if not control, of other banks in the Detroit area outside the limits of the city. The first purchase so made was of 508 shares of stock in the Ulrich Savings Bank of Mt. Clemens. It was followed by similar purchases of stock in the Citizens Savings Bank of Mt. Clemens, the First State Bank of East Detroit, and others. Loans made to the company therefor were approved by the board of directors. Fearnley testified that these stocks were taken in the name of the defendant or himself, or both of them, because of a ruling of the banking department that a corporation could not hold stock in a bank, and that "the certificates were indorsed over and left in the files as property of the American-Detroit Company."

About November 5, 1929, a deal was consummated by the defendant and Fearnley by which the stock of the Guaranty State Bank of Detroit was taken over by the American State Bank, and the purchase ratified at special meetings of stockholders held for that purpose in January, 1930. Under the deal as made, the stockholders in the Guaranty bank acquired one and one-quarter shares of stock in the American State Bank, on which was indorsed the beneficial interest of the holder in the American-Detroit Company, for one share in the Guaranty State Bank. Fearnley testified that, as a result of this purchase and the manner in which the capital stock and surplus of the two banks were adjusted, there was a capital gain of $1,100,000, and this was "deposited to an account known as reserve for contingencies," and "maintained as a deposit liability of the bank," and was not listed as an asset in its published statements. Evart G. McGugan, a State bank examiner, testified that he talked with the

defendant about this reserve fund and consented to its being "set up" in that way. He later wrote to the bank about it, saying—

"that the hidden reserve account for contingencies now on your commercial ledger in amount of $1,000,000 is to be kept a definite reserve for future losses which may result from losses in your assets."

This "reserve for contingencies" account was created by the defendant and Fearnley without the knowledge or consent of any of the other directors. Fearnley testified that he and defendant—

"treated it as a liability deposit account, knowing that there were certain charges that had to come out of it, growing out of the Guaranty deal;"

that, as he understood it, it did not "belong to the bank at the time the deposit was made," and that he thought the charges afterwards made against it were proper charges. However, in answer to questions asked him by the court, he said that it grew out of the deal between the American State Bank and the Guaranty State Bank, and that "it was the profit of and was owned * * * by the American State Bank." This account as kept in the bank shows that it was credited on June 17, 1930, with $100,000; on July 21st with $25,000, and on September 13th with $50,000, "Transferred to American-Detroit Co.," and Fearnley testified that he and the defendant had, through a broker, made an effort to support the stock market price of the American State Bank stock, and that this transfer was made for that purpose. But he also testified:

"The first time I learned of these transfers, totaling $175,000, from the reserve for contingency fund,

was when Mr. Nelson called it to my attention in December of 1930.''

Steps were thereafter taken by the defendant and Fearnley to organize the American State Bankers' Company (not a corporation), but of which the defendant was to be president and Fearnley vice-president, to take title to such bank stocks as had been acquired by the American-Detroit Company. Counsel for the defendant state that:

"The plans in connection therewith, however, were not carried out, due to the depression which made it impossible to sell the securities.''

Herman G. Taylor, a State bank examiner, testified that at a meeting of the board of directors of the bank on February 28, 1931, he gave them a combined set up of the American-Detroit Company and the American State Bankers; that the assets were so commingled that it was not practical to separate them; that the defendant then stated that he would be able to show where the money had gone, but at a later meeting, held on March 5th, he failed to do so, although then present. Taylor understood that the American-Detroit Company had been legally organized, and such was the understanding of all of the directors, except the defendant.

Walter Van Goethem, an employee of the bank for about 20 years, assistant cashier in 1929, and cashier after January, 1930, testified that the defendant was, during those years, engaged in the purchasing of stock through brokerage houses; that many such stocks for defendant had been delivered to him for defendant, and he had turned them over to him. It has seemed necessary to detail these transactions in order that the charge as made and the defense thereto may be fairly understood.

The first item set forth in the bill of particulars is:

"April 7, 1930    $52,743.70    Check No. 3 American-Detroit Co. payable to and indorsed by Robert M. Allan. This item formed part of the funds which were used to purchase cashier's check No. 152,309 —$65,000 payable to Samuel Ungerleider & Co.—for which said brokers delivered 1,000 shares Bohn Aluminum stock."

There seems to be no dispute about the facts relating to this transaction. An account in the name of the American State Bank was kept by defendant with Samuel Ungerleider & Co., brokers. On April 3, 1930, at the request of the defendant, this company purchased 1,000 shares of Bohn Aluminum stock for a total of $65,000. On April 5th, Van Goethem, at the request of defendant, signed a cashier's check for this amount, payable to the brokers, and took it to their office and delivered it to them, receiving therefor the 1,000 shares of stock, which he turned over to the defendant. This stock and 800 other shares of the same stock was on April 9th delivered by the defendant to the same brokers and deposited in an account kept by them in the name of Jane C. Allan, defendant's wife and for whom he had a power of attorney to act, and on the same day the brokers gave defendant their check for $79,200, payable to Jane C. Allan, which was indorsed by Jane C. Allan and the defendant and afterwards paid. This check was deposited by the defendant on the same day to

the credit of his personal account in the State Savings Bank of Melvindale, of which he was president, and in which he kept his personal account. To make payment to the bank of the amount of the cashier's check for $65,000, defendant issued a check, payable to himself, signed by the American-Detroit Company "By Robert M. Allan," for $52,743.70, and paid the balance out of his personal funds. Defendant had theretofore, on April 4th, instructed William Duall, an assistant auditor of the bank, to make an entry in the "reserve for contingencies" account, reading as follows:

"Equity of $3.75 per share representing
  25,000 shares providing for Guaranty
  State Bank stockholders' interest in the
  American-Detroit Co. .................. 93,750"

And this amount was charged to that account and credited to the account of the American-Detroit Company. The balance to the credit of the company prior to this transfer was but $12,401.18.

On June 16th defendant purchased 1,000 shares of Warner Brothers stock from Morris & Townsend, brokers, for $51,321.69, and paid for it with a cashier's check of the American State Bank. To reimburse the bank, defendant's check on the American-Detroit Company was given, and, to provide for its payment and another check, drawn on the same day for $59,500, $100,000 was transferred in the same way on the books of the bank under defendant's instruction from the "reserve for contingencies" account to that of the American-Detroit Company. This stock was delivered by the defendant to Ungerleider & Co., on June 17th, and held in that account until September 23d, when it was sold at a loss and the proceeds credited to the Jane C. Allan account.

These transfers from the "reserve for contingencies" account, and payments by the American-Detroit Company, were made without the knowledge, consent, or authority of the board of directors of the bank, who had no knowledge that such an account had been created in the bank.

It is the contention of counsel for the defendant that as to the item of $52,743.70 there was no embezzlement on his part; "that he was entitled to use the American-Detroit Company's check" in that sum "to reimburse himself for a like amount previously advanced by him for and on behalf of the American-Detroit Company."

As to the item of $51,321.69, counsel contend that defendant was entitled to issue this check "by reason of the fact that the American-Detroit Company was at that time indebted to him in an amount in excess" of this amount; that:

"He personally had advanced sums in excess of the amount * * * in order that stock purchased for the American-Detroit Company, through the Allan-Fearnley special account, might be paid for, and that at the time that the charge was made against the account of the American-Detroit Company, the latter was indebted to the defendant in an amount in excess of that withdrawal,"

and counsel add:

"In other words, defendant claimed he honestly believed that the relationship of debtor and creditor existed between him and the American-Detroit Company, and that he honestly believed that he therefore had the right to issue said charge against the American-Detroit Company in said amount to reimburse himself in part."

The defendant was not sworn as a witness. The court very properly instructed the jury that they

had "no right to draw any inferences, whatsoever, unfavorable to him because of his failure to take the stand and testify in his own behalf." We have alluded to this fact, not as in any way indicative of defendant's guilt, but to make it clear that, when the claims of the defendant are spoken of, reference is being had to the statements of his counsel.

Mr. Fearnley testified that after the purchase of the Guaranty State Bank stock an account was opened with Joel Stockard & Company, a brokerage firm, in the name of the defendant and himself for the purchase of stock of the American State Bank, the object being to support the market price of the stock; that this account was opened by the defendant without consulting him, but he afterwards knew about it; that it was thus opened in their names instead of the American-Detroit Company as a matter of convenience; that he did not put any money in it, nor did the defendant to his knowledge; that so far as he knew "it was all American-Detroit Company money," and that "at the end we owed approximately $325,000." It does not appear that any of the other officers or directors had any knowledge of these transactions.

Defendant's counsel sought to put in evidence the ledger account of certain purchases of stock, as kept by Joel Stockard & Company, and certain receipts to defendant and Fearnley by them for stock thus purchased. These transactions occurred in March, 1930, and it is the claim of counsel that defendant used his own money in making such purchases and that the moneys he withdrew from the "reserve for contingencies" account in the bank and placed to the credit of the American-Detroit Company were used by him to repay him for the moneys advanced by him to make such purchases.

The records and receipts were produced by a bank examiner, who in some way had charge of them, it appearing that the brokerage firm was then in the hands of a receiver. An objection was made on the ground that the witness had no personal knowledge of their authenticity. The objection was sustained. Later, when another witness was on the stand and there was argument over the admission of items of similar import, counsel for defendant said:

"I want to prove by this witness that Mr. Allan purchased stock on the Allan and Fearnley account, paid for it himself, and was a creditor of the company because of the advances he made to the company, and that later on, if he took the money out, he was justified in so doing.

"*The Court:* You don't mean that last statement, do you, took back money for the stock he had bought?

"*Mr. Schueler:* I say that if he took back money he had loaned, he was entitled to do so.

"*Mr. O'Hara:* If he puts that testimony in, all right. We object to it now."

Thereupon the objection was overruled and the witness (the cashier, Van Goethem) was permitted to testify as to the transaction and identified some of the exhibits above referred to and others of similar nature. The jury were thus informed that the defendant had with his own money purchased stock in the American State Bank through Joel Stockard & Company, but there is no proof that he was authorized to do so by the board of directors or that such stock afterwards became the property of the bank. Mr. Fearnley personally had nothing to do with these transactions, and his only knowledge as to them were statements made to him by the defendant, and therefore inadmissible as evidence.

Walter Van Goethem, the cashier of the bank since January, 1930, testified that he had heard of the American-Detroit Company; that defendant told him he was the president of that corporation; that Frank C. McDonald, the auditor of the bank, called his attention to the fact that no books were being kept of the records and transactions of that company, and that he directed him to the defendant; that they askèd Fearnley about it, and he said he would take it up with the defendant; that—

"I was asked to sign checks disbursing the funds of the American-Detroit Company by Mr. Allan. I did so because he told me to. He was my superior officer. It was part of my duties to follow his instructions;"

that the first entry thereof is one charging—

"the new capital account—general account on the books, and it is a credit to the American-Detroit Company commercial account for $375,000. It was O.K.'d by Mr. Allan by his initials;"

that on June 17th there was made on the books a transfer of $100,000—

"from the reserve for contingency fund of the American State Bank to the account of the American-Detroit Company. I made out a debit ticket at the time, representing that transfer;"

that he made it at the request of the defendant, and it was his recollection that defendant O.K.'d it. He testified relative to the check for $51,321.69 that it was made on June 16, 1930; that:

"Mr. Allan called me into his office and told me to make a charge to the American-Detroit Company for this amount; that the American-Detroit Company had owed him for some bank stock that he had

paid for, and that I should get a cashier's check made out payable to Morrison & Townsend for a like amount; that Morrison & Townsend was delivering some stock which I believe Morrison & Townsend did, and this was used to pay for it;''

and that defendant told him that the check was to be used to pay for some stock that would be delivered to him by Morrison & Townsend, and that this check was charged to the American-Detroit Company on June 18th at defendant's request.

A careful examination of the record fails to disclose that the bank was in any way indebted to the defendant at the time these moneys were drawn out of the "reserve for contingencies" account. That he had dealings with Joel Stockard & Company, a brokerage concern, clearly appears, and some of these dealings were in reference to the purchase of American State Bank stock, but they are in no way connected with the transactions above referred to, wherein the funds withdrawn were used by him in the purchase of stock in his own name and that of his wife.

But counsel insist that as the moneys so used by him were transferred to the account of the American-Detroit Company, and withdrawn therefrom by him, the embezzlement, if any, was of the moneys of that company, and not of the bank.

The trial court held that the American-Detroit Company was not a *de facto* corporation, and that the moneys credited to it on the books of the bank were the moneys of the bank. One of the counsel for the defendant apparently so conceded. In answer to a question put to him by the court, he said: ''There is no showing that it is a *de facto* corporation, and there isn't sufficient proof to have the court hold it was.'' But the fact on which the charge of

embezzlement may safely rest was the unlawful appropriation of the moneys of the bank in its "reserve for contingencies" account to his own use, and the fact that he unlawfully had it transferred on the books of the bank to the credit of the American-Detroit Company before using it for his own purpose in no way affected his liability therefor.

After the arraignment of defendant, and before trial, his attorneys filed a motion to quash the information. It then consisted of five counts. Among the reasons assigned were:

"Because said information is fatally defective in that it is duplicitous.

"Because said information is fatally defective in that there is contained therein a misjoinder of counts.

"Because said information charges said defendant with separate and distinct offenses, not of the same general nature and belonging to the same family of crimes, the mode of trial thereof and the nature of the punishment not being the same.

"Because said information is fatally defective in that the allegations therein are repugnant to each other."

Neither the argument had, nor ruling of the court denying the same, appear in the record. It is apparent, however, that the reasons then advanced were based on the fact that the several counts charged separate and distinct offenses. In two of the counts it was set forth that the money embezzled was the property of the American-Detroit Company.

This motion was, in effect, renewed after the opening statement of the prosecutor, who then made claim that the American-Detroit Company was not a *de facto* corporation, and counsel for the defendant then urged:

"If that be so, then Mr. Allan cannot be charged with embezzlement, for the reason that he could not convert moneys that belonged to himself."

Counsel for defendant here insist that the claim of duplicity in the motion to quash referred to the joinder of the three offenses, embezzlement, abstraction, and misapplication, in the same count. These are separate and distinct offenses, and if this defect in the information had been pointed out it would have been the duty of the court to "sever such indictment into separate indictments or informations or into separate counts" as should be proper (3 Comp. Laws 1929, § 17289). *People* v. *Mears,* 251 Mich. 359. But the after proceedings during the trial clearly indicate that no such specific claim was then made, and also clearly show that the words "abstraction and misapplication" were considered and treated as included in the charge of embezzlement.

In support of a motion for a directed verdict, made at the conclusion of the people's opening statement, counsel for the defendant said:

"Your honor has declined to quash this information upon the theory that the moneys alleged to have been taken, alleged to have been converted at the same time and under similar circumstances; that, I assume, was the theory of your honor's declining to quash the information."

At the conclusion of the proofs submitted by the prosecution, defendant's counsel moved—

"for an order compelling the State to elect upon which counts in the information the State proposes to go to the jury upon."

In the discussion which followed, counsel for the defendant said:

"There has been testimony let into this case after your honor denied the motion to quash on the theory that the State would put in its proofs, and from the proofs it would be determined which count applied thereto. Now the State's proofs are in. Now the purpose your honor admitted the testimony and denied the motion to quash has been satisfied."

The motion to elect was denied. It was renewed after the proofs were closed. On the court's announcement, after argument, that he would instruct the jury that the American-Detroit Company was not a *de facto* corporation and that the moneys placed to its credit on the books of the bank were the moneys of the bank itself, the prosecution elected to proceed under the first count.

The requests to charge preferred by defendant's counsel clearly indicate that in their opinion the motion to quash had been, in effect, granted by the action of the court in requiring the prosecution to elect as before stated. They also sustain the statement above made that the charge in the first count was considered as one of embezzlement. We refer to them as numbered:

3. This request read in part as follows:

"I instruct you, members of the jury, that the charge made against the defendant is that of embezzlement drawn within the terms of the banking act (3 Comp. Laws 1929, § 11963) of the State of Michigan."

20. The charge in this request is again referred to as "the embezzlement" of $106,565.39.

22. We quote therefrom:

"I instruct you, members of the jury, the charge being embezzlement, that the gist of the offense of embezzlement is a breach of trust."

In several other of the requests the offense is referred to as embezzlement.

Defendant's assignment of error No. 154 reads as follows:

"The court erred in denying the defendant's motion for a directed verdict of not guilty on the first count of the information, made after the State had elected to go to the jury on the first count, for the reason that the proofs introduced by the State were not sufficient to warrant the court in submitting the case to the jury on the first count, and that the funds alleged to have been embezzled were not proven to be the funds of the American State Bank, or held in trust by the American State Bank."

There are many other suggestions and statements of defendant's counsel during the trial of similar import. They lead to the irresistible conclusion that the charge as stated in the first count of the information was treated throughout the entire trial as one of embezzlement.

In *United States* v. *Youtsey,* 91 Fed. 864, Judge Taft (afterwards Chief Justice of the United States Supreme Court), in defining these separate offenses, said:

"Embezzlement is the unlawful conversion by an officer of the bank to his own use of funds intrusted to him, with intent to injure or defraud the bank. Abstraction and misapplication are a conversion to his own use by an officer of the bank of funds of the bank which are not especially intrusted to his care."

Other courts have said that, where the charge is misapplication, it may be shown that the moneys were converted to the use of another person than the one charged. The terms are not synonymous, but clearly the term "embezzlement" may include the others. *State* v. *Hudson,* 93 W. Va. 435 (117 S. E. 122). No objection having been made in the

trial court to the form of the information in this respect, we might decline to consider it under the provisions of 3 Comp. Laws 1929, § 17290. We are, however, inclined to treat the information as though a severance had been had and the three charges set forth in separate counts. Had this been done, as it clearly appears that the offenses grew out of and relate to substantially the same transactions and were committed by the same acts and at the same times and the same evidence must be relied on for conviction, no election between the counts could have been required. *People* v. *Sweeney,* 55 Mich. 586; *People* v. *Cabassa,* 249 Mich. 543; *People* v. *Marks,* 255 Mich. 271; *People* v. *Lahey,* 256 Mich. 250.

The verdict was a general one. The transactions relied on to sustain the charge of embezzlement, heretofore referred to at length, had no tendency to establish either abstraction or misapplication. They clearly show that the defendant unlawfully converted the moneys of the bank intrusted to his care as its president to his own use. His intent to thereby injure or defraud the bank was a question for the jury. In the absence of explanation on his part, no other reasonable conclusion could have been reached than is indicated by the verdict rendered, which upon this record must be treated as "guilty of embezzlement," and the charges of abstraction and misapplication regarded as surplusage. *Hopkins* v. *McClaughry,* 126 C. C. A. 545 (209 Fed. 821); *Theobald* v. *United States* (C. C. A.), 3 Fed. (2d) 601. While the facts in *People* v. *Kolowich,* 262 Mich. 137, are somewhat different, it may be read with profit. See, also, *People* v. *Hager,* 262 Mich. 198, and *People* v. *Lewis,* 262 Mich. 308.

Error is assigned upon the admission of proof of other acts of the defendant bearing upon the intent

with which he caused the money of the bank to be withdrawn therefrom and the conversion of it to his own use. These are spoken of as "intent items," and when such evidence was admitted, and also in his charge, the trial court instructed the jury that they should be considered only in their bearing upon the question of defendant's intent. The evidence thus admitted all related to transactions of like character to that with which defendant was charged, and was clearly admissible for the purpose for which it was received. 3 Comp. Laws 1929, § 17320; *People* v. *Mears, supra; People* v. *Armstrong,* 256 Mich. 191; *People* v. *Dixon,* 259 Mich. 229.

It is claimed that evidence was excluded which tended to establish the absence of such intent on his part. Since intent from its nature is incapable of direct proof, great latitude is necessarily permitted in proving it, and any evidence is admissible which has a tendency to establish it. On the other hand, the same latitude should be permitted to show the *bona fides* of the defendant. Mr. Dohany, on cross-examination, was asked:

"There would be nothing illegal on the part of the American-Detroit Company to purchase American State Bank stock?"

The court sustained the objection on the ground that the question called for a legal conclusion. In this he was clearly right, as, if the answer was material, it was for the court, and not for the witness, to pass upon it.

Mr. Fearnley was asked whether he and the directors thought it would be necessary or for the best interests of the bank to have a securities company, and whether he and the directors deemed certain transactions in the interest of the bank. Had the question been limited to the judgment of the wit-

ness, it might have been admissible, but, as asked, it was clearly subject to the objection made, which was sustained.

Many errors are assigned on the charge of the court and the refusal to give certain requests preferred by defendant's counsel. With respect to the matter last above referred to, the court said:

"Counsel, under the law, have the right to have their theories presented to the jury by the court, bearing in mind, however, of course, that unless there is testimony in support of these theories, that is, responsible testimony in the case, of course you have no right to consider such theories. And as I said to you before I shall refer to them during my charge and bearing in mind that counsel for both the State and defense *are entitled, under the law, to have their theories presented to the jury by the court, and entitled to have them considered by you, bearing in mind as I said, that you should examine the evidence and see whether or not there is evidence in support of any theory advanced."

It is urged that this instruction and others of like import cast the burden of proof of innocence upon the defendant. We do not so understand it. The record contains many statements of counsel as to the claims made and theories advanced by the defendant. Unless supported by evidence, they had no weight and could not be considered. The instructions given, taken as a whole, in no way shifted the burden of proof to the defendant or violated the rule that the people must prove every material allegation in the charge as made.

After testifying relative to the deal by which the assets of the Guaranty State Bank were acquired by

the American State Bank, Mr. Fearnley was asked by defendant's counsel:

"That showed now, Mr. Fearnley, a profit to the American State Bank of $1,100,000, did it not?"

After objection that the witness should not testify to that fact, there was much discussion, and the question does not seem to have been ruled on by the court. The facts relating to the placing of the above amount in the "reserve for contingencies" fund were, however, fully developed, as before stated, and, if the objection be treated as having been erroneously sustained, no reversible error resulted therefrom.

At the conclusion of the proofs, on motion of defendant's counsel, the prosecutor elected to proceed upon the first count. An order was thereupon entered—

"that the second, third, fourth, and fifth counts of the information may be and hereby are withdrawn, and as to those four counts, the defendant stands discharged."

Counsel for the defendant insist that "the defendant has been convicted of that of which he has been previously acquitted."

The third count charged the defendant with embezzlement under the general law. The order entered would have precluded a subsequent trial therefor had he been acquitted under the first count. *Hall* v. *People*, 43 Mich. 417; *People* v. *Lahey, supra.* But the entry, which is, in effect, but a *nolle prosequi* or discontinuance as to the four counts, in no way affected the right of the people to proceed under the first count. The cases relied upon all refer to the effect of such an order in after proceedings, where the trial resulted in a conviction.

It is urged that "the defendant did not have a fair trial." Many of the reasons assigned in support of this claim have been heretofore considered. It is claimed that the remarks and argument of counsel for the people were prejudicial. As to many of them in the opening statement of counsel on which errors are assigned, we find that no objection was made thereto, and those to which objections were made present no reversible error. The only objection made to the opening argument of Mr. Robinson to the jury was at its close when counsel then said:

"We take exception to the entire argument, and especially the concluding paragraph of the attorney general."

It seems to be elementary that if intemperate or unauthorized statements are made in argument the attention of the court must be called to them at the time to warrant the predication of error thereon.

There were but few interruptions during the closing argument of Mr. O'Hara. An exception was, however, in like manner taken at its close. The objections made consisted largely to the conclusions which he contended should be drawn from the testimony submitted. In view of the careful manner in which the claims of the respective parties in this respect were submitted to the jury by the trial court, we refrain from their specific consideration, as it clearly appears that no prejudicial error could have resulted therefrom.

It is also urged that the trial court unduly participated in the proceedings in the manner and character of the questions asked and the comments made from the bench. The record discloses little, if any, justification for such a claim. The trial judge was indeed patient in permitting defendant's counsel to submit a number of motions for an election between

counts, and for a mistrial, and to indulge in lengthy arguments in support thereof. The questions put to counsel and the remarks made in denial of such motions were not improper, under the circumstances, and the questions asked witnesses were in no way suggestive of the opinion of the court as to how they should be answered.

There are 244 assignments of error, covering 168 pages of the printed record. Their consideration has imposed a task on this court to which it should not have been subjected. There are few cases in which the errors claimed to be meritorious may not be stated in a reasonable number of assignments. This is demonstrated by the application of Court Rule No. 69 (1931), which requires a statement of the "questions involved" to be printed on the first page of the brief for the appellant, and with which counsel have generally complied. We allude to the record in this respect in the hope that counsel will consider it a duty they owe to this court to limit the assignments within reasonable bounds. We have read these assignments, and have discussed those which in our opinion merit consideration.

The judgment is affirmed.

CLARK, NORTH, and FEAD, JJ., concurred with SHARPE, J.


POTTER, J. (*for reversal*). The information filed against defendant contained five counts, four of which were dropped. Defendant was convicted on one count in the information which charged three separate and distinct offenses, namely, *first,* wilful and felonious embezzlement of the sum of $106,565.39 from the American State Bank; *second,* wilful and felonious abstraction of the same money in the same amount from the same bank; and *third,*

wilful and felonious misapplication of the same sum of money belonging to the same bank. All three offenses charged in this count of the information are based upon 3 Comp. Laws 1929, § 11963.

Objection was properly and timely made to the information for duplicity. The objection was overruled.

1. It is said defendant did not pursue this objection. How could he? When once an objection is made in proper form and ruling made thereon by the trial court, the question may be passed upon by the appellate court as fully and completely as though the question had been raised and passed upon an infinite number of times. *Scripps* v. *Reilly,* 38 Mich. 10. Indeed, after a question has been squarely raised and passed upon by the trial court, repeatedly re-raising the same question on the trial has been criticized by this court. *O'Connor* v. *Madison,* 98 Mich. 183.

2. There is no doubt, under the law of this State, different offenses may be charged in the same information and if the different offenses charged grow out of the same transaction, are supported by the same evidence and involve the same penalty, an election between counts may not be compelled. *People* v. *McKinney,* 10 Mich. 54; *Van Sickle* v. *People,* 29 Mich. 61; *People* v. *Sweeney,* 55 Mich. 586; *People* v. *Dyer,* 79 Mich. 480; *People* v. *Summers,* 115 Mich. 537; *People* v. *Warner,* 201 Mich. 547; *People* v. *Grabiec,* 210 Mich. 559; *People* v. *Marks,* 255 Mich. 271.

3. "The doctrine is well settled in this State that a person should not be subjected to trial for two separate and distinct offenses at one time. This rule is applied to cases of felony in most, if not all, of the States, and has been applied to misdemeanors in Michigan." *People* v. *Rohrer,* 100 Mich. 126.

See, also, *People* v. *Jenness,* 5 Mich. 305; *People* v. *Aikin,* 66 Mich. 460 (11 Am. St. Rep. 512); *People* v. *Jackman,* 96 Mich. 269; *Chase* v. *Van Buren Circuit Judge,* 148 Mich. 149.

4. "If two or more distinct offenses are charged in the same count, the accused would have no means of knowing upon which charge the prosecutor would rely, and the jury might agree upon a verdict of guilty, while unable to agree upon any one of the charges." *Tiedke* v. *City of Saginaw,* 43 Mich. 64.

See, also, *People* v. *Jenness, supra; People* v. *Mc-Kinney, supra; Hamilton* v. *People,* 29 Mich. 173; *People* v. *Jackman, supra; People* v. *Hamilton,* 101 Mich. 87; *People* v. *Shuler,* 136 Mich. 161; *Chase* v. *Van Buren Circuit Judge, supra; People* v. *Smith,* 177 Mich. 358; *People* v. *Czckay,* 218 Mich. 660; *People* v. *Marks, supra.*

5. The three offenses charged in the information are separate, inconsistent, distinct offenses. This case does not fall within that line of cases above cited where "the several acts are construed as so many steps or stages in the same affair, and the offender may be informed against as for one combined act in violation of the law, and proof of either of the acts mentioned in the statute and set forth in the information will sustain a conviction." *State* v. *Schweiter,* 27 Kan. 499; *People* v. *Keefer,* 97 Mich. 15; *People* v. *Marks, supra.* The count in the information upon which defendant was convicted was void for duplicity.

6. Defendant was convicted by general verdict of guilty. It does not appear that 12 jurors agreed upon his conviction of any offense. For aught that appears from the record, four of the jurors may have found defendant guilty of embezzlement, four of felonious abstraction, and four of felonious mis-

application of the same money. Defendant was entitled to the verdict of all the jurors upon one distinct offense. This has been denied him.

Conviction should be reversed.

McDONALD, C. J., concurred with POTTER, J.

WIEST, J. (*for reversal*). Defendant was charged in one count of an information with the commission of three distinct crimes: embezzlement, felonious abstraction, and criminal misapplication of funds of the American State Bank. He was found guilty. Guilty of what? I do not know, and no one can tell from this record. An inquiry on this subject from the bench, at the time of argument, went unanswered.

A series of acts may involve the commission of one or more crimes, and each crime may be charged singly, but conviction or convictions must be specific. Embezzlement implies a lawful possession, followed by felonious conversion. Felonious abstraction implies a criminal taking. Felonious misapplication implies a criminal diversion of funds. Such conversion, abstraction, and diversion are not synonymous terms; they relate to distinct offenses, and proof of one negatives others.

My brother finds embezzlement established. Did all of the jurors so find, or may some have joined in the general verdict on a finding of guilty of abstraction or misapplication?

I think the conviction should be reversed, and a new trial granted.

McDONALD, C. J., and POTTER and BUTZEL, JJ., concurred with WIEST, J.